NELSON A. ELSASSER, EXECUTOR, ESTATE OF MORRIS NATHAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11448.   Promulgated June 18, 1928.

*Maynard Teall, Esq.*, for the petitioner.
*Frank T. Horner, Esq.*, for the respondent.

OPINION.

ARUNDELL: In determining the deficiency in dispute the respondent included in the decedent's gross estate the value of all of the stock of the two corporations under the theory that the stock issued to Mrs. Nathan and Mrs. Elsasser, and the stock assigned by Nathan to his grandchildren, were transfers made by the decedent to take effect in possession or enjoyment at or after his death. The evidence before us is contrary to such contention.

Immediately after the acceptance on November 26, 1917, by the board of directors of each corporation of the offers made by the deceased for the sale of the properties described in our findings of fact, in part or full payment of which all of the capital stock of each corporation was issued, Morris Nathan directed that certificates for 20 shares each in the Mona Realty Co. and 150 shares each in the Nathan Realty Co. be issued in favor of his wife, and his daughter, Mrs. Hulda N. Elsasser. This was done, and upon the delivery of the certificates to him he promptly handed them to the persons in whose favor they had been executed. Neither Mrs. Nathan nor Mrs. Elsasser ever transferred the certificates back to the deceased. They continued to hold the stock until after Nathan's death on June 12, 1920. With the exception of the stock certificates issued to Mrs. Nathan and Mrs. Elsasser, all the capital stock of the Nathan Realty Co. was executed in favor of and delivered to the deceased on November 26, 1917. Immediately upon the delivery of the stock to him he endorsed certificates Nos. 4 and 5 of the Mona Realty Co., each for 20 shares, and Nos. 7 to 16, inclusive, of the Nathan Realty Co., each for 200 shares, in blank, inserted the stock in equal proportions in envelopes addressed to Leonard and David Elsasser, minor grandchildren, and after sealing the envelopes handed them to the father of the boys with the statement that "These are for the boys" or words to that effect. He then directed the bookkeeper of the corporations to make an endorsement on the stubs of the certificates that the stock had been transferred to his grandsons, which was done. The stock, endorsed in blank by the record owner, remained in the possession of the father of the transferees until after the death of the decedent.

The evidence shows that the stock issued to Mrs. Nathan and Mrs. Elsasser was never owned by the deceased and that the assignments to the grandchildren were absolute and unconditional transfers to take effect immediately. The respondent erred in including the value of this stock in the gross estate of the deceased.

The respondent has placed a valuation of $907.23 and $166.06 per share on the capital stock of the Mona Realty Co. and Nathan Realty Co., respectively, as of June 12, 1920, for estate-tax purposes. We

have not been informed of the method employed by him in determining such values, but it would seem that he placed higher valuations on the real estate holdings of the two corporations than we have found from all the evidence before us. The petitioner is contending for a stock valuation of $200 a share for the Mona Realty Co. and $80 per share for the Nathan Realty Co. In the determination of these values counsel for the petitioner used a unique method. In the case of the former company he first adjusted the value of the real estate holdings by accepting as the proper value thereof the average of the values placed upon the lot and buildings by petitioner's witnesses and from the increased value of the corporation's assets over its liabilities, finds a value of each share of stock of $418.89. To this figure he added the book value of the stock figured according to the value at which the real estate was carried on the books ($128.89) and the average of the values at which the stock was returned in 1920 and 1921 for capital stock purposes ($84.31). From the sum of these figures he reached an average of $210.70, which he proceded to reduce to $200 because the value of the stock of the minority interest in a close corporation is not equal to a proportionate value of the whole. A similar method was used in reaching a value for the stock of the Nathan Realty Co. The valuations lack a proper basis and can not be accepted as the proper values of the stock in question.

The stock of both corporations was closely held and there have not been any sales in the open market to use as a basis or a guide for a valuation here. Under such circumstances, we will examine the assets and earnings of the corporations and from these and other relevant evidence in the record, reach values having a proper relation thereto.

Neither corporation had any source of income other than rents from their properties. The property of the Mona Realty Company was under lease at an annual rental of $7,500 per annum. This rental was practically net, since under the terms of the lease the lessee was required to keep the building in repair; make such improvements as might be necessary under state laws; pay all water, gas, electricity and heating bills; pay taxes and assessments and keep the building insured against loss by fire in the sum of $13,500. At June 12, 1920, the lease had about 2 years and 3 months yet to run. From the time of its organization to that date the corporation built up a surplus of $7,889.11. We have not been advised of the terms of the leases under which the real estate of the Nathan Realty Co. was being rented. In 1918 and 1919 its earnings were $17,135.21 and $12,830.27, respectively.

All of the four witnesses presented by the petitioner to testify concerning the fair market value of the real estate of the two corporations were, because of their business connections, years of experience and knowledge of property values in the business section of Johnstown, especially qualified to express an opinion on the worth of the property in question. Three of these witnesses had had from 20 to 30 years of experience in the real estate or an associated business and had been engaged for many years in making appraisals of real estate in Johnstown for railroads, life insurance companies and local financial institutions. The other witness, David Barry, had been cashier or president of the First National Bank of Johnstown for 27 years, and in his official capacity he passed upon the value of property for the purpose of making loans thereon. We have been favorably impressed with the qualifications of these witnesses to express an opinion on the fair market value of the assets in question. Three of these witnesses testified that the Main Street land had a fair market value of $3,000 a front foot. The other witness placed a valuation of $2,800 a front foot on the lot owned by the Mona Realty Co. and $3,080 a front foot on the ground owned by the Nathan Realty Co. Their valuations on the theatre building range from $12,000 to $16,000. Their valuations of the lots and buildings located on Lincoln Street were equally as consistent.

In this proceeding the respondent submitted the depositions of five witnesses who testified of values on some of the property somewhat in excess of the petitioner's witnesses. None of these witnesses testified on the value of the improvements on the Lincoln Street lots and only one of them expressed an opinion on the land. With the exception of H. H. Benford, who had been engaged in the real estate and insurance business for 30 years, we were not favorably impressed with their qualifications as expert witnesses and were, therefore, unable to attach much weight to their opinions. After carefully considering the testimony as a whole, we are satisfied that the valuations found in our findings of fact represent the fair market value of the various properties as of June 12, 1920, the date of the decedent's death.

By adjusting the assets of the corporations on account of the values we have found for their real estate holdings, we find that the net worth of the Mona Realty Co. on June 12, 1920, was $42,639.11, or $426.39 per share, and the Nathan Realty Co. $467,262, or $133.50 per share. From all the evidence we are of the opinion that these figures represent proper values for the stock in question as of June 12, 1920, for the purpose of determining the estate-tax liability of the estate.

*Judgment will be entered under Rule 50.*