ESTATE OF HENRY E. HUNTINGTON, DECEASED, SECURITY-FIRST NATIONAL BANK OF LOS ANGELES, SUCCESSOR TO LOS ANGELES-FIRST NATIONAL TRUST & SAVINGS BANK, AND THE PACIFIC SOUTHWEST TRUST & SAVINGS BANK, AND CAROLINE H. HOLLADAY, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 47552. Promulgated October 22, 1937.

*E. H. Conley, Esq., Joseph D. Peeler, Esq., Todd W. Johnson, Esq., P. D. Johnston, Esq.,* and *Robert N. Miller, Esq.,* for the petitioners.

*Allen H. Pierce, Esq., Frank T. Horner, Esq., B. H. Neblett, Esq., Harold F. Noneman, Esq.,* and *W. S. Tandrow, Esq.,* for the respondent.

702

## OPINION.

Most of the transcript in this proceeding consists of testimony minutely describing all of those various parcels of real estate, both the Los Angeles and Vernon properties and the suburban properties, with regard to their location, size, and boundaries, their contours and particular characteristics, their state of improvements or lack thereof, their water supply and transportation facilities or lack thereof, their desirability or undesirability, their highest and best use, their salability or lack thereof, the use, if any, to which they were being put on May 23, 1927, the restrictions or lack thereof as to their use; and also of testimony as to the character and use of the surrounding properties and the class of its residents, residences, and schools in the various vicinities, the sales of adjoining and nearby properties, both comparable and otherwise, the trends of sales and prices of real estate, and the building activities and growths in population in the various vicinities in which the properties were located. In addition to such testimony, the record is replete with data compiled from the Huntington Co.'s records, maps of the properties in question, charts, tables and data covering a period of years as to population, trends of sales, building permits issued, and their value per dollar per capita, the number of subdivisions and lots put on the market during certain periods in the various vicinities in which the properties involved were located, estimated price trends, etc., in each of the various localities in which these various parcels were situated and, also, expert testimony as to economic conditions in the City and County of Los Angeles, in either one or the other of

which all the real properties were located. The transcript also includes the testimony of numerous witnesses, appearing as experts on behalf of both parties, who expressed their widely varying opinions as to the fair market value on May 23, 1927, of the parcels of real estate considered by them either separately or in groups.

We have studied the record in its every detail with regard to every parcel of real estate, the value of which is in controversy, and have determined the fair market value of the designated items of real estate from this whole record, both parties having tried this incidental issue as to the value of the Huntington Co.'s real property and submitted their evidence upon an item by item basis. In our findings of, fact on this issue, we did not present a detailed review of the facts nor a finding of our determination of the item by item values, since we do not deem either necessary for the purposes of this opinion. The immediate fact sought here is the value of the real property owned by the Huntington Co., for the purpose of determining the principal issue, namely, the value of that corporation's 1,000 shares of stock on May 23, 1927. As set forth in our findings of fact on this issue, we have found as a fact the fair market value on May 23, 1927, of the Huntington Co.'s real properties in controversy, as grouped by the parties according to general location, to be in the total amount of $13,796,582. Such value plus the stipulated value of certain real property in the amount of $381,895, as set forth in the findings of fact, results in a total fair market value of $14,178,477 for all of the real estate owned by Huntington Co. on May 23, 1927.

In determining the fair market values of the numerous real properties of the Huntington Co. as of May 23, 1927, we have carefully considered all of the relevant facts, including comparative sales and all the various other factors affecting the market value of the properties, as established by the record. Also, we have given thorough consideration to the expert opinions of value as testified to by the numerous witnesses, considered and weighed in the light of their particular qualifications, their knowledge of the actual facts as definitely established by the record, and their particular methods of valuation.

The values as above found for the properties in the designated localities represent our best judgment or conclusion of fact, upon this record, of "that fair market value so often judicially defined as the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell." See *Elmhurst Cemetery Co.* v. *Commissioner*, 300 U. S. 37. Each value determined by us is directly supported by comparable sales, corroborative expert opinions and the clearly established facts of record. We do not deem it necessary to enter into a discussion of the various theories and methods advanced and used by some of the

real estate witnesses, other than to state that we have not applied any one of their widely varying percentages of discounts based on factors which we regard as purely speculative. Some of the witnesses determined what they usually denominated as prospective or gross selling price of the real properties and then, to arrive at what, in their opinion, was the fair market value thereof, deducted discounts ranging from 5 percent to over 45 percent. Such discounts (variously embracing some or all of the factors of future taxes, carrying charges, interest on the investment during the estimated period of sale, selling expenses, and a profit on sales in the future) were primarily based upon the period of time required for ultimate disposition of all of the properties, which period was variously estimated at from approximately two and one-half years to twenty-five years or more. The testimony of these various witnesses applying these proposed discounts discloses a great and irreconcilable conflict as to the percentage of discount, as to what factors should compose the total discount percentage, as to the proportions of each factor included in the discount percentage, and as to the length of time required to dispose of the real property, which conflict very definitely establishes the fact that such proposed discounts are predicated upon such speculative and indeterminable future developments that an attempt on our part to arrive at values based upon any specific percentage of discount would constitute a mere guess, as appears to have been the case on the part of the witnesses using this method.

In support of a contention that petitioners make to the effect that a discount of at least 33⅓ percent should be allowed in arriving at the fair market value of the real estate, petitioners rely principally upon *H. D. Sheldon*, 25 B. T. A. 5; *Commissioner* v. *Elmhurst Cemetery Co.*, 83 Fed. (2d) 4; and *Fairmount Cemetery Assn.* v. *Helvering*, 79 Fed. (2d) 163. The *Sheldon* case does not support petitioners' contention, but rather is an authority to the contrary, for in that case, involving the value of real estate, the taxpayers claimed a 25 percent discount based on elements much less speculative than are the elements of the proposed discount in the instant case and the Board specifically held that the value contended for by the taxpayers "is based on a prospective element which we think must be eliminated in determining the fair market price or value at the basic date." The Board then determined the fair market value of the properties therein controversy to be an amount equivalent to the value testified to by an expert witness. It may also be said that this contention is now deprived of what support, if any, it may have been afforded by the *Elmhurst Cemetery Co.* and *Fairmount Cemetery Assn.* cases, *supra*, for the reason that subsequent to the filing of the petitioners' briefs herein, in which

these cases were cited, the Circuit Court's decision in the *Elmhurst* case was reversed by the Supreme Court in 300 U. S. 37, and the Circuit Court rendering the cited opinion in the *Fairmount Cemetery Assn.* case subsequently rendered a second opinion therein reversing the position taken by it in its first opinion. 92 Fed. (2d) 496. An examination of many other Board and court cases, too numerous to cite, does not disclose, in our opinion, any authority for the allowance of a definite percentage of discount based upon such highly speculative elements as are shown in this case and which may or may not materialize subsequent to the basic date.

### *Issue No. 2.—Value of Stock of the Huntington Co.*

#### FINDINGS OF FACT.

At date of his death, May 23, 1927, Henry E. Huntington owned all the outstanding 1,000 shares, $100 par value each, of the capital stock of the Huntington Co. and had continuously owned such shares, including the directors' qualifying shares, since that company's incorporation under the laws of California in February 1902.

At the time the Huntington Co. was incorporated in 1902, Henry E. Huntington was actively connected with the building and expansion of railway transportation systems in southern California. The Huntington Co. was organized primarily for the purpose of acquiring real estate along the railroad rights of way and especially in the vicinity of proposed railway extensions so as to reap the benefits from the anticipated enhancement in land values.

The greater portion of the Huntington Co.'s vast holdings of real properties was acquired between 1902 and 1914. Subsequent to 1914 the Huntington Co. made relatively few purchases of real property and they were usually for the purpose of rounding out the boundaries of properties already owned, the principal exception being the purchase of approximately 300 acres in San Marino in February 1927 for $2,331,700 from the trustees of the Henry E. Huntington Library and Art Gallery, pursuant to the provisions of an agreement set forth in exhibit 53, included herein by reference.

The active sale of the Huntington Co.'s properties commenced in about 1910. The company's peak year prior to the World War was 1913, when sales aggregated approximately $3,492,000. The period of the World War was one of comparative inactivity in real estate and Huntington Co.'s sales fell off sharply during that period, but in 1920 there was a definite resumption of its real estate sales activity. The peak of its sales activity as well as that of other real estate in southern California was reached in 1923 and continued through

the early part of 1924, following which there was a decline in the number of sales made, but during 1925, 1926, and 1927 and, for that matter, on up into the year 1929, real estate prices and values generally continued at about the same level, although in some localities the trends were slightly downward while in other localities, such as San Marino, they were slightly upward. Aside from 1923, a boom year, and the early part of 1924, the years immediately preceding Henry E. Huntington's death were more or less normal years in real estate activity and values and on the basic date of May 23, 1927, there was no indication or reasonable expectation of a future decline in either.

During the period of several years prior to May 23, 1927, the Huntington Co. was engaged principally in the business of subdividing acreage and selling vacant residential and business properties owned by it, and already subdivided, in various localities in the City and County of Los Angeles, California. The actual work of subdividing acreage and installing utilities, streets, and other improvements therein was usually done by it through contractors and its selling activities were largely conducted through some independent sales agency which maintained its own sales organization. During several years prior to May 23, 1927, the Huntington Co.'s so-called suburban properties were listed for sale with the Frank Meline Co., one of the largest real estate brokers in southern California, under oral contract or understanding at specified commissions. During the same period the Los Angeles and Vernon properties were not listed for sale with any particular real estate broker or agency. During that period the general policy of the Huntington Co. was to subdivide its acreage properties and to sell its vacant improved lots as rapidly as the management deemed the market could absorb such character of property. It did not make a practice of selling its acreage to other subdividers although a few sales of acreage were made. Since May 23, 1927, the date of decedent's death, that general policy has been continued without interruption and there has been no attempt to force liquidation of the Huntington Co.'s properties or to wind up its business and affairs. The Huntington Co.'s gross sales of real estate for the years 1922 to 1929, in approximate round figures, were as follows:

| | | | |
|---|---|---|---|
| 1922 | $2,087,000 | 1926 | $1,387,000 |
| 1923 | 4,881,000 | 1927 | 1,152,000 |
| 1924 | 1,855,000 | 1928 | 1,306,000 |
| 1925 | 1,086,000 | 1929 | 1,354,000 |

From the time of its organization to the time of his death on May 23, 1927, Henry E. Huntington, as sole stockholder and president of the Huntington Co., controlled its activities and policies. There

have been no transfers of any of that company's capital stock and the stock was not listed on any stock exchange. No dividends were ever paid thereon prior to Henry E. Huntington's death, but thereafter the following dividends were declared by the Huntington Co.'s board of directors and paid:

| | |
|---|---|
| Dividend No. 1, December 31, 1928 | $250,000 |
| Dividend No. 2, October 31, 1929 | 100,000 |
| Dividend No. 3, December 30, 1929 | 425,000 |
| Dividend No. 4, February 24, 1930 | 200,000 |

While no dividends were paid prior to Henry E. Huntington's death, the Huntington Co.'s earned surplus and book net worth increased by substantial amounts each year during the years 1922 to 1926, inclusive, as is disclosed by the company's comparative balance sheets for those years, as follows:

| Year | Earned surplus | Net worth per books, represented by the accounts of capital stock, earned surplus, appraised appreciation suspense and unrealized profit on real estate sales, both taxable and and nontaxable |
|---|---|---|
| Dec. 31, 1922 | $4,259,763.20 | $11,269,432.38 |
| Dec. 31, 1923 | 5,767,535.27 | 12,559,191.31 |
| Dec. 31, 1924 | 7,000,310.50 | 13,360,168.58 |
| Dec. 31, 1925 | 7,644,581.29 | 13,461,875.98 |
| Dec. 31, 1926 | 8,055,522.92 | 13,597,878.61 |

The first column of figures in the following tabulation shows the balance sheet per books of the Huntington Co. as of May 31, 1927, the end of the month nearest the date of Henry E. Huntington's death and accepted by both parties as being of May 23, 1927; and, the second column of figures in such tabulation shows the fair market value of the company's assets other than real estate and its liabilities on May 23, 1927, as agreed to by the parties:

| Assets | Book value based on March 1, 1913, value or cost | Agreed fair market value of assets as of May 23, 1927 |
|---|---|---|
| Real estate | $11,421,239.54 | (Value in controversy) |
| Securities owned | 1,349,909.05 | $1,325,874.16 |
| Miscellaneous personal property | 58,515.50 | 55,956.80 |
| Cash | 411,322.73 | 411,322.73 |
| Bills receivable | 2,823,381.47 | 2,823,381.47 |
| Accounts receivable | 203,463.79 | 131,899.07 |
| Operating suspense | 3,914.72 | 2,153.09 |
| Expense and discount on bond | 5,513.13 | 0.00 |
| Total book value May 31, 1927 | 16,277,259.93 | |
| Agreed fair market value of assets other than real estate, May 23, 1927 | | 4,750,587.32 |

| Liabilities | As per books on May 23, 1927 | Agreed liabilities as of May 23, 1927 |
|---|---|---|
| Suspense | $1,750.00 | $1,750.00 |
| Bonds outstanding | 765,400.00 | 765,400.00 |
| Bills payable | 512,400.00 | 512,400.00 |
| Accounts payable | 98,486.51 | 98,486.51 |
| Henry E. Huntington—advances, etc | 1,428,043.79 | 1,428,043.79 |
| Reserve for depreciation | 32,513.70 | 0.00 |
| Reserve for real estate improvements | 15,556.90 | 0.00 |
| Income taxes, 1926 | 0.00 | 11,998.53 |
| Total liabilities | 2,854,150.90 | 2,818,078.83 |
| Net worth per books on May 23, 1927, based on March 1, 1913, value and subsequent cost of real estate | 13,423,109.03 | |

Such book net worth was represented on the books by the following accounts:

| | |
|---|---|
| Capital stock | $100,000.00 |
| Earned surplus | 7,919,703.83 |
| Appraisal appreciation suspense | 4,695,440.31 |
| Profits prior to 3–1–13 now realized | 63,603.37 |
| Unrealized profits on real estate sales—taxable | 478,155.24 |
| Unrealized profits on real estate sales—nontaxable | 1,273.48 |
| Profit and loss to April 30, 1927 | 154,040.67 |
| Profit and loss for May, 1927 | 10,892.13 |
| | 13,423,109.03 |

The Huntington Co. kept its books of account on the cash receipts and disbursements method and profits from real estate sales were accounted for on the installment sales method.

The real estate owned by the Huntington Co. on May 23, 1927, had cost that company the total amount of $6,725,799.23, as per books. In or about 1917 the company had caused an appraisal to be made of the value, as of March 1, 1913, of its real properties acquired prior to that date and such value, together with the cost of real properties acquired subsequent to March 1, 1913, was set up as the book value of its real estate, represented by the figures of $9,089,539.54 for real estate exclusive of the Library lands and $2,331,700 for the Library lands (the cost thereof in February 1927), or a total book value of $11,421,239.54, as shown on the above balance sheet. The respondent does not admit the correctness of the Huntington Co.'s appraised value as of March 1, 1913, of real property owned on that date nor is there any issue, in this proceeding, involving the March 1, 1913, value of such properties. The excess of such March 1, 1913, appraisal value over cost was carried on the books as "Appraisal Appreciation Suspense" in the amount of $4,695,440.31.

The asset accounts designated "Securities Owned" and "Bills Receivable", shown on the balance sheet, represent, to a large extent, investments in and extensions of credit to subsidiaries of the Huntington Co. or other corporations controlled by Henry E. Huntington.

at the time of his death, as shown by the following tabulation based upon the agreed fair market value of such assets as of May 23, 1927.

"Securities Owned":

| | |
|---|---:|
| San Gabriel Valley Water Co. stock (wholly owned subsidiary) | $300, 626. 04 |
| Standard Felt Corp. stock (wholly owned subsidiary) | 750, 000. 00 |
| Los Angeles Railway Land Co. stock (wholly owned subsidiary) | 158, 218. 81 |
| Investment in above securities | 1, 208, 844. 85 |
| Balance of securities owned | 117, 029. 31 |
| Total of all securities owned | 1, 325, 874. 16 |

"Bills Receivable":

| | |
|---|---:|
| Los Angeles Railway Corporation notes (all stock owned by H. E. Huntington) | $1, 553, 232. 64 |
| San Gabriel Valley Water Co. loans (wholly owned subsidiary) | 405, 783. 00 |
| Total of above listed bills receivable | 1, 959, 015. 64 |
| Sales contracts | 864, 365. 83 |
| Total of all bills receivable | 2, 823, 381. 47 |

The liability account "Bonds Outstanding—$765,400.00" shown on the balance sheet represents the unretired portion of bonds issued by the Huntington Co. in the face amount of $14,000,000 in 1913. To a large extent the other liabilities shown on the balance sheet represent accounts owed to subsidiaries of the Huntington Co. or to corporations controlled by Henry E. Huntington at the date of his death, as shown by the following tabulation based upon the agreed liabilities as of May 23, 1927:

*Liabilities*

| | |
|---|---:|
| Bills payable: | |
| To Redondo Improvement Co. (¾ stock owned by H. E. Huntington) | $447, 000. 00 |
| To Standard Felt Corporation (wholly owned subsidiary) | 25, 000. 00 |
| To Los Angeles Railway Land Co. (wholly owned subsidiary) | 40, 000. 00 |
| Accounts payable: | |
| To Los Angeles Railway Corporation, contingent liability (all stock owned by H. E. Huntington) | 63, 741. 83 |
| To Henry E. Huntington—advances, etc | 1, 428, 043. 79 |
| Total of the above listed liabilities | 2, 004, 185. 62 |
| Bonds outstanding | 765, 400. 00 |
| All other liabilities | 48, 493. 21 |
| Total of all liabilities | 2, 818, 078. 83 |

There have been submitted in evidence four main exhibits, Nos. 206, 207, 214, and Z W, each of which sets forth a computation of the Huntington Co.'s annual earnings over a period of years, but which it is unnecessary to include herein verbatim. Petitioners' exhibit 206 sets forth in some detail the current book net income

for the years 1922 to 1932, inclusive, before income tax, on the cash method of accounting, except as to profits on real estate sales which were accounted for on the installment sales method, the basis being March 1, 1913, value and subsequent cost of real seate. Petitioners' exhibit 207 begins with the book net income for the same years as shown in exhibit 206 and sets forth the various adjustments, the net taxable income, and the income taxes as determined by the Commissioner, and also the nontaxable appreciation prior to March 1, 1913, realized in each year. Respondent's exhibit Z W sets forth in detail the company's net income per books from all sources after various adjustments and income taxes, including in gross income the net profit on real estate sales on the installment method and upon the basis of original cost. With regard to *earnings*, these three exhibits may be summarized as follows:

| Year | Exhibit 206 Net profits per books, real estate profit based on 3/1/13 value and subsequent cost—before income tax | Exhibit 207 Taxable net income, based on 3/1/13 value and cost as adjusted by Commissioner | Exhibit 207 Realized appreciation prior to 3/1/13, not taxable | Exhibit Z W Net profit from all sources, real estate profit based on original cost—after income tax |
|---|---|---|---|---|
| 1922 | $254,389.34 | $151,136.45 | $389,195.86 | $618,261.05 |
| 1923 | 256,468.77 | 530,311.18 | 1,488,155.84 | 1,485,260.19 |
| 1924 | 981,351.95 | 859,624.29 | 226,257.37 | 1,312,553.34 |
| 1925 | 567,559.78 | 509,842.07 | 86,181.16 | 693,069.14 |
| 1926 | 413,057.83 | 218,832.94 | 150,518.48 | 462,492.53 |
| 1927 | 703,121.64 | 660,899.91 | 140,002.31 | 709,289.82 |
| 1928 | 551,741.85 | 466,436.91 | 96,049.37 | 629,899.88 |
| 1929 | 614,335.36 | 659,585.98 | 284,192.03 | 847,737.36 |
| 1930 | 327,444.54 | 331,459.67 | 71,491.83 | |
| 1931 | 209,953.27 | 131,064.01 | (23,840.40) | |
| 1932 | 50,817.76 | (110,750.48) | (7,927.18) | |

Petitioners' exhibit 214 is a comparative statement prepared from the Huntington Co.'s books for the period of five years and five months ended May 31, 1927 (including an average per year for such period), setting forth the company's current accounts of income and expense in great detail. In this exhibit the profits on sales of real estate are determined on the basis of original cost and are accounted for on a method of closed sales as of the times the sales were made as distinguished from the installment sales method. Inasmuch as this exhibit sets forth details not contained in the above mentioned exhibits as to earnings and expenses, and the petitioners and their expert stock witnesses rely largely upon this exhibit, and, further, since we are not here determining the Huntington Co.'s net income on its regular method of accounting for income tax purposes, we shall use this exhibit for analysis of the company's earnings in so far as it relates to our investigation as to the value of the stock. The averages per year as shown on exhibit 214 are as follows:

*Income:*

| | |
|---|---:|
| Gross real estate sales | $2,172,964.52 |
| Less—Cancellations | 150,310.49 |
| Net real estate sales | 2,022,654.03 |
| Profits on cancellation | 6,571.87 |
| Real estate rentals | 273,922.34 |
| Dividend on stocks owned | 4,432.53 |
| Miscellaneous income | 4,979.18 |
| Interest received | 221,624.95 |
| Interest on bonds owned | 96,851.18 |
| Total income | 2,631,036.08 |
| Less—Loss on ranch operations | 30,919.98 |
| Balance total income | 2,600,116.10 |

*Sales expense:*

| | |
|---|---:|
| Sales commissions | 176,547.15 |
| Discounts on sales | 10,917.89 |
| Miscellaneous selling expenses | 6,798.88 |
| Total sales expense | 194,263.92 |

*Other expenses:*

| | |
|---|---:|
| Taxes | 203,734.75 |
| Real estate expense (upkeep) | 34,803.74 |
| Administration | 38,508.02 |
| Depreciation | 10,796.48 |
| Interest | 31,307.50 |
| Interest on collateral trust bonds | 195,090.00 |
| Discount on notes | 25,151.24 |
| Miscellaneous expenses | 2,458.78 |
| Total other expense | 541,850.51 |
| Grand total expenses | $736,114.43 |

| | |
|---|---:|
| Net income before deducting cost of properties sold | $1,864,001.67 |
| Book value of properties sold | 1,228,846.43 |
| Net income (before income taxes) based on book values | 635,155.24 |
| Profit realized out of excess of March 1, 1913, values over cost | 477,394.06 |
| Net income (before income taxes) based on cost | 1,112,549.30 |

The above average per year tabulation discloses that the Huntington Co.'s net income from all sources other than the profit on sales of real estate exceeds by the amount of $35,611.56 all expenses except the sales expense directly incurred as a result of sales of real estate. The Huntington Co. depended upon the sale of its real estate assets to reap any substantial profits. Its income from sources other than profits on real estate sales was sufficient to pay all operating and carrying costs during the period of sales. The average rentals per annum alone exceeded the average taxes, real estate upkeep expense, and depreciation per annum by the amount of $24,587.37. The administration expense was applicable to the entire operations and af-

fairs of the company and is not chargeable in its entirety to real estate as an expense thereof, and nowhere in the record is it shown as to what part thereof, if any, is chargeable to the real estate.

The stipulated fair market value, on May 23, 1927, of the Huntington Co.'s net assets other than real estate was $1,932,508.49, which together with the total fair market value on May 23, 1927, of all of that company's real property in the amount of $14,178,477, results in a total fair market value, on the basic date of $16,110,985.49 for that company's net assets underlying its 1,000 outstanding shares of stock.

The fair market value, on May 23, 1927, of the 1,000 outstanding shares of stock of the Huntington Co. was equivalent to the fair market value of its net assets, to wit, $16,110,985.49 or $16,110.98549 per share.

### OPINION.

Our study of all the facts and circumstances and of the varying expert opinions and methods used by those experts, leads us to the conclusion that the Huntington Co.'s earnings do not furnish any reliable criterion for the fair valuation of the stock in question. That company was principally engaged in the business of subdividing and selling land, a large portion of which was acquired prior to March 1, 1913, and had greatly appreciated in value by May 23, 1927. Its profits were dependent upon sales of its real estate. Exhibit Z W shows that for the years 1922 to 1926, inclusive, the company had an average yearly net profit of $983,968.72 per books on sales of real estate accounted for on the installment sales method upon the basis of original cost. Such profits, both taxable and nontaxable, were derived from the sales of its real estate assets, constituting by far the greater part of its capital structure, and afford no reliable criterion, by capitalization or otherwise, for determining the fair market value, on May 23, 1927, of the stock of the company whose principal asset is a vast amount of *other* real estate on hand in several localities and having widely varying characteristics and cost bases.

The expert witnesses for petitioners testified that they considered the company's earnings, but have failed to explain clearly just how such earnings figured in their valuations of the stock. In the final analysis, most of those experts placed their stock valuations upon the basis of the stipulated assets plus their valuation of the real estate assets less liabilities. Generally, they assumed that the respondent's determination of the value of the real estate represented the gross selling price thereof and then in arriving at their valuations of these real estate assets they applied varying percentages of discounts to give effect to some or all of such factors as expenses, carrying charges,

including commissions and taxes, the net return to the company on the sale of its real property reduced to present worth, and capital risk, each factor being dependent upon the period of time which in the opinion of the witnesses testifying would be required to sell all of the real estate. The result so obtained was, in effect, their *net asset value* of the real estate, to which they added the stipulated net asset value of the company's other assets, and fixed the value of the stock at such resultant total. It is clear that the stock valuations of these witnesses are based upon their application of discounts which we have hereinabove disapproved, for the reasons assigned, in our determination of the value of the real estate and, consequently, can not be accepted as a basis for our determination of the value of the stock.

In asserting the deficiency herein the respondent determined the value of the stock upon the basis of the mathematical difference between the value of the assets less liabilities. The respondent's expert witnesses have used the same method, after assuming that the real estate had a fair market value of $17,307,000, apparently the total of the highest values testified to by respondent's real estate experts.

It is unnecessary to review the numerous prior decisions of this Board and of the courts involving the question of the valuation of stock under many and varied circumstances. There is no established controlling method for arriving at the value of stock. *James Couzens*, 11 B. T. A. 1040, 1045, 1165. The problem of a fair determination of the value of stock must be solved by the exercise of sound judgment through the application of a method which is fair and proper under the facts and circumstances as they may appear in each particular case in which the problem is presented. We have carefully considered all of the facts in this voluminous record, including the earnings and book worth of the Huntington Co. and the character of its assets, and we have weighed the expert opinions in the light of the established facts. Where, as in this proceeding, there have been no sales of the stock of a close corporation and, because of the nature of its business and earnings, such earnings and the other facts shown by the record do not afford fair and proper criteria, we may look to the fair market value of the assets underlying the stock to ascertain the value thereof.[1]

We have determined that the items of real estate in controversy, together with the stipulated items, had an aggregate fair market

[1] *Frederick A. Koch, Jr., Executor,* 28 B. T. A. 363; *Lillian G. McEwan,* 26 B. T. A. 726; *Melville Hanscom et al., Executors,* 24 B. T. A. 173; *Rauh Realty Co.,* 23 B. T. A. 820; *P. C. Pendleton et al., Executors,* 20 B. T. A. 618; *George F. Milton, Jr., Executor,* 17 B. T. A. 380; *Kanawha City Co.,* 13 B. T. A. 912; *Estate of David Weingarten,* 13 B. T. A. 249; *Nelson A. Elsasser, Executor,* 12 B. T. A. 681.

value on May 23, 1927, of $14,178,477, which together with the stipulated fair market value of the Huntington Co.'s other net assets in the amount of $1,932,508.49, results in a total fair market value, on the basic date, of $16,110,985.49 for that company's net assets underlying its outstanding shares of stock.

Upon this record, it is our conclusion that the 1,000 outstanding shares of stock of the Huntington Co., on May 23, 1927, had a fair market value equivalent to the fair market value of its underlying net assets. We have therefore concluded and found as a fact that such stock, on said basic date, had a fair market value of $16,110,-985.49, or $16,110.98549 per share.

*Issue No. 3.—Value of Real Estate of the Redondo Co.*

### FINDINGS OF FACT.

By stipulation and for the purposes of identification and convenience the parties have listed and given the legal descriptions of all of the Redondo Co.'s real properties arbitrarily divided into 84 items, some of the items containing many separate parcels of real estate. The parties have stipulated that the total fair market value, on May 23, 1927, of items 82, 83, and 84, comprising the Redondo Ranch, the Athens acreage, and the business property at the intersection of Figueroa Street and Santa Barbara Avenue in the city of Los Angeles, was $295,000. All of the remaining items include downtown, residential, and acreage property located within the corporate limits of the city of Redondo Beach, except item 81, which is adjacent thereto. That city is a beach town, having a two-mile frontage on the Pacific Ocean, and is located about four miles from Torrance, an industrial town, about twelve or fifteen miles northwest of Long Beach and about five miles from the nearest portion of the Los Angeles city limits, but about twenty miles southwest of downtown Los Angeles. In 1927 it had a permanent population of about 8,600, consisting principally of families having moderate incomes and low cost homes.

In general the 81 items, the value of which is in controversy, consisted of approximately 40 acres platted in blocks, but not lots, and about 2,000 vacant lots, of which lots only a small percentage had been fully improved with streets and public utilities, while others had been partially so improved or had such improvements available, but a large number of the 2,000 lots had been merely platted many years prior to 1927 and had the appearance of raw acreage. Stipulation No. 6, included herein by reference, sets forth in detail the extent of the improvements or lack thereof as to each item. The downtown properties consisted of six items in or near the business

section of the city practically surrounding the city park, which adjoined the beach, and the best potential use of such items would be for service stations, bungalow courts, or apartment houses.. However, in 1927, only portions thereof were being used and they were used for a gasoline station and auto parking. The fully improved residential lots were those nearest to the beach, while the partially improved residential lots were farther eastward from the beach. The platted but generally unimproved lots and acreage were in the eastern half of the city, and a portion of that area was leased for drilling after the discovery of oil in commercial quantities in about 1919, but further drilling was prevented by injunction suits brought by the trustees of Redondo Beach by virtue of a city ordinance which was sustained by public vote in 1923 and again in 1926. In stipulation No. 4 and a stipulation dictated into the record the parties have agreed that Redondo Co.'s oil rights had a fair market value of $50,900 on May 23, 1927, separate from the land values here in controversy. All the real property of the Redondo Co. was generally rolling land with some sharp contours and very low spots in various places and some portions had little value for residential purposes, while other portions were very attractive subdivision properties.

The real estate embraced in items 1 to 81 had an aggregate fair market value of $1,335,922 on May 23, 1927, and such value plus the stipulated fair market value of $295,000 of items 82, 83, and 84, or the amount of $1,630,922, constitutes the total fair market value of all the real estate owned by the Redondo Co. on May 23, 1927.

### OPINION.

The many volumes of testimony and the numerous exhibits, consisting of maps, charts, tables of trends, etc., with regard to the particular circumstances surrounding the properties of the Redondo Co. and the widely varying discounts used by several witnesses in arriving at their valuations, closely parallel the character of the testimony and evidence heretofore outlined in connection with the real properties of the Huntington Co.

After a careful consideration of all the evidence and upon the same line of reasoning as applied in determining the fair market value of the real properties of the Huntington Co., we have determined the fair market values of the Redondo Co.'s numerous real properties designated as items 1 to 81, as set forth in the findings of fact on this issue. Each value so determined by us is directly supported by comparable sales, corroborative expert opinions, and clearly established facts of record. For the reasons heretofore stated

with reference to the Huntington Co.'s properties, we do not deem it necessary to make a finding of our determination of the item by item values. As set forth in our findings of fact on this issue, we have found as a fact the aggregate fair market value, on May 23, 1927, of the Redondo Co.'s real properties designated as items 1 to 81 and the stipulated value of items 82, 83, and 84, and, also, the total fair market value of all such items.

*Issue No. 4.—Value of Stock of the Redondo Co.*

### FINDINGS OF FACT.

At the time of his death, Henry E. Huntington owned 3,750 shares of the outstanding 5,000 shares of the stock of the Redondo Co., a corporation organized under the laws of California in 1898. Its authorized and outstanding capital stock, at all times since May 1, 1905, has consisted of 5,000 shares of the par value of $100 per share.

On or about July 1, 1905, Henry E. Huntington acquired all of the capital stock of the Redondo Co. and shortly thereafter in the same year transferred 1,250 shares of the stock to Arabella D. Huntington, his wife. Henry E. Huntington had continuously owned the 3,750 shares from 1905 to the date of his death. The stock of the Redondo Co. has never been listed or traded in on any exchange and no sale of any part thereof was ever made prior to the basic date, except as above stated.

During its existence the Redondo Co. has been principally engaged in the business of selling its real estate in the form of lots and the properties owned on May 23, 1927, with few exceptions, constituted the remainder of the real estate acquired prior to 1905. With very few exceptions, the real estate was not improved with buildings and the rental income from the properties embraced in items 1 to 81 was derived mainly from temporary uses of a small part thereof.

Since May 1921 the Redondo Co. has maintained its office in space shared by the Huntington Co. with several corporations in the Los Angeles Railway Buildings, in Los Angeles. The Redondo Co.'s officers were practically the same as were the officers of the Huntington Co. In 1922, which was the peak year, the company's sales of real estate amounted to $321,200 in Redondo Beach. Following that year there was a sharp decline in its sales, the amounts thereof ranging from approximately $55,596 in 1923 to $1,000 in 1927, or an average of $19,341.27 over that period of years. In 1927 and immediately prior thereto the Redondo Co. had no sales force or field organization except one salaried employee and instituted no special sales campaign to dispose of its properties. The Redondo Co. did

not employ high pressure sales methods, such as the bus and dinner method, which was testified to by some of the expert real estate witnesses in applying their discounts as a sales method which would cost varying percentages up to 40 percent of the sales price of the lots. Its general policy was to fix lot prices at the time opportunities to sell were presented, but in a few instances list or asking prices were prepared in advance.

The Redondo Co.'s books were kept on the cash receipts and disbursements method of accounting. Its real property was carried on the books at the appraised March 1, 1913, value plus the cost of subsequently acquired property. The appreciated March 1, 1913, value over original cost as carried on the books was designated "Appraisal Appreciation Suspense."

The first column of figures in the following tabulation shows the Redondo Co.'s balance sheet as of June 30, 1927 (the nearest date to the basic date of May 23, 1927, for which information of the character contained therein was available); and the second column of figures in such tabulation shows the fair market value of certain of its assets and the amount of that company's liabilities on May 23, 1927, as agreed to by the parties:

| | Per books as of June 30, 1927 | Agreed fair market value on May 23, 1927 |
|---|---|---|
| **ASSETS** | | |
| Real estate—Redondo Beach (items 1 to 81) | $691, 751. 39 | (in controversy) |
| Other real estate (stipulated items 82, 83, 84) | 114, 890. 24 | $295, 000. 00 |
| Furniture and fixtures | 1, 004. 97 | 487. 47 |
| Cash | 4, 453. 13 | 4, 453. 13 |
| Rents collectible | 2, 025. 00 | |
| Accounts receivable | 924. 13 | 2, 664. 37 |
| Taxes receivable | 11. 28 | |
| Contingent refunds | 7, 511. 61 | 3, 225. 00 |
| Bills receivable | 550, 504. 75 | 550, 504. 75 |
| H. E. Huntington (outlawed by statute of limitations, never paid and charged off in 1927 | 110, 631. 25 | |
| Oil rights | | 50, 900. 00 |
| Total | 1, 483, 707. 75 | 907, 234. 72 |
| **LIABILITIES AND CAPITAL** | | |
| Advance rentals | 3, 225. 00 | 3, 225. 00 |
| Income taxes | | 4, 950. 48 |
| Capital stock | 500, 000. 00 | |
| Appraisal appreciation suspense | 378, 844. 80 | |
| Reserve for accrued depreciation | 517. 50 | |
| Reserve for depletion oil property | 13, 374. 80 | |
| Surplus: | | |
| Balance Jan. 1, 1927 ____ $598, 631. 06 | | |
| Add: Profit prior to March 1, 1913 now realized ____ 162. 00 | | |
| ____ 598, 793. 06 | | |
| Less: 1st installment, 1926 income tax ____ 1, 504. 54 | | |
| ____ 597, 288. 52 | | |
| Less: Loss period Jan. 1, 1927, to June 30, 1927 ____ 9, 542. 87 | 587, 745. 65 | |
| Total | 1, 483, 707. 75 | 8, 175. 48 |

The Redondo Co.'s book net worth on June 30, 1927, is represented by the following accounts:

Capital stock _____ $500,000.00
Appraisal appreciation suspense _____ 378,844.80
Surplus _____ 587,745.65

1,466,590.45

Less: H. E. Huntington account receivable, outlawed and never paid _____ $110,631.25

Book net worth _____ 1,355,959.20

Respondent's exhibit BT, as per books with certain adjustments, sets forth the Redondo Co.'s current accounts of income and expense for several years and the averages of the regular recurring items of income and expenses per year for the period 1923 to 1927, inclusive, and shows the following:

| Income | Average per year | Expenses | Average per year |
|--------|------------------|----------|------------------|
| Rentals | $9,079.66 | Operating expense | $6,446.99 |
| Oil royalty | 16,483.60 | Real estate expense | 4,708.01 |
| Interest | 33,917.88 | Commissions | 641.20 |
| Profit on real estate, based on cost | 12,326.86 | Discounts | 56.00 |
| | | Interest expense | 54.83 |
| Total income | 71,808.00 | Taxes | 29,905.05 |
| | | Total current expenses | 41,812.08 |
| | | Average excess per year of current income over current expenses | 29,995.92 |

The above average per year tabulation discloses that the Redondo Co.'s regular recurring items of income from sources other than its profits from sales of real estate, exceeded by the amount of $17,669.06 that company's regular recurring expenses. To realize any substantial profits, the Redondo Co. had to depend upon the sale of its real estate, which constituted its principal capital asset.

The stipulated fair market value, on May 23, 1927, of the Redondo Co.'s net assets other than real estate was $604,059.24, which together with the total fair market value, on May 23, 1927, of all of that company's real property in the amount of $1,630,922, results in a total fair market value, on the basic date, of $2,234,981.24 for that company's net assets underlying its 5,000 outstanding shares of stock.

The fair market value, on May 23, 1927, of the 5,000 outstanding shares of stock of the Redondo Co. was equivalent to the fair market value of that company's net assets, to wit, $2,234,981.24, or $446.9962 per share. The fair market value of the 3,750 shares of such stock owned by Henry E. Huntington, at date of death, was $1,676,235.75.

OPINION.

The testimony of the expert witnesses and the numerous exhibits with regard to the value of the stock of the Redondo Co., and also the

widely varying discounts used by several witnesses in arriving at their valuation of the net assets, which net asset valuation was identical in amount with their valuation of the stock of the Redondo Co., closely parallel the character of the testimony and evidence heretofore outlined in connection with the value of the stock of the Huntington Co. After consideration of all the facts and circumstances and the expert opinions relative to the value of the stock of the Redondo Co., we conclude that the fair market value of the 5,000 shares of stock of that company must be determined upon the same line of reasoning heretofore stated with regard to the value of the stock of the Huntington Co. and with the same resultant conclusion, i. e., that the fair market value of the stock of the Redondo Co. is equivalent to the fair market value of its net assets.

We have determined that the items of real property in controversy, together with the stipulated items, had an aggregate fair market value, on May 23, 1927, of $1,630,922, which, together with the stipulated fair market value of the Redondo Co.'s other net assets in the amount of $604,059.24, results in a total fair market value, on the basic date, of $2,234,981.24 for that company's net assets underlying its outstanding shares of stock.

Upon this record it is our conclusion that the 5,000 outstanding shares of stock of the Redondo Co., on May 23, 1927, had a fair market value equivalent to the fair market value of that company's underlying net assets. We have therefore found as a fact that such stock, on the basic date, had a fair market value of $446.9962 per share and that the 3,750 shares of such stock owned by the decedent, at date of death, had a total fair market value of $1,676,235.75 on that date.

*Issue No. 5.—Note Discounts, Premiums, and Expenses.*

### FINDINGS OF FACT.

All of the facts with respect to this issue are set forth in stipulation No. 11 and the exhibits attached thereto, which by reference are included herein. This issue presents solely the question of law as to whether or not there may be deducted from the gross estate the total amount of $543,408.88, or any part thereof, including discounts in the amount of $364,386, and premiums in the amount of $94,391.27 paid in connection with the issuance and retirement of a $9,500,000 note issue by the executors of the estate of Henry E. Huntington, expenses paid in connection with the issuance of said notes in the amount of $49,368.68 and expenses paid in connection with their retirement in the amount of $35,262.93. The respondent has not allowed any part of the total amount of $543,408.88 as a deduction in his determination of the net taxable estate.

The executors of the estate of Henry E. Huntington, who died testate on May 23, 1927, were qualified and appointed as such on June 8, 1927, and they filed a Federal estate tax return on November 21, 1928. On or about November 2, 1928, the executors filed with the Superior Court, Los Angeles County, California, a petition for authority to issue unsecured five-year 6 percent notes of the estate in the face amount of $9,500,000, and to sell said notes for a price of 96 percent of their face value and, further, to redeem them prior to maturity pursuant to a schedule of premiums set forth in the petition.

The petition set forth that the will of Henry E. Huntington provided for the payment of all transfer, succession, or legacy taxes out of the estate and that the purposes for which the money was to be borrowed were to pay the then estimated unpaid Federal estate and California inheritance taxes, amounting to approximately $6,199,-076.49; approved and allowed claims against the estate in the sum of approximately $3,626,461.07, exclusive of interest; expenses in connection with the note issue and other expenses in connection with the administration and probate of the estate, including, *inter alia*, fees of executors and attorneys. The petition recited that the advantages accruing to the estate from such note issue would enable it to pay taxes, claims, and proper expenses, "without the necessity of sacrificing by immediate or forced sale the assets of said estate", which "would result in great and irreparable injury to the estate." Attached to the petition was a copy of the indenture proposed to be executed covering said note issue.

On November 14, 1928, the Superior Court entered an order authorizing the note issue for the purposes enumerated in the petition and providing in part as follows:

* * * it appearing to the court and the court being satisfied, after a full hearing, that it will be for the advantage, benefit and best interest of the Estate of said decedent, Henry E. Huntington, to borrow said money and execute said notes without security, and to execute said indenture, as prayed for in said petition, and it further appearing to the court that the interest to be paid upon said notes, the terms and provisions thereof, and the terms and provisions of said indenture attached to said petition and to this order, and the price to be obtained for said notes are fair, just and reasonable and that it will be for the advantage, benefit and best interest of said Estate to sell said notes for said price;

IT IS HEREBY ORDERED AND DECREED by the court that * * * the said petitioners, Caroline H. Holladay and Los Angeles-First National Trust & Savings Bank, Executors of the Estate of Henry E. Huntington, deceased, are hereby authorized, empowered and directed to borrow Nine Million Five Hundred Thousand Dollars ($9,500,000) less discount as hereinafter set forth, upon five year six per cent notes of said estate, and to make and execute said notes, which said notes are hereby found to be unsecured notes, and which said notes shall be dated November 1, 1928 and shall be due and payable November 1, 1933, with interest at six per cent per annum, payable semi-annually from the

date of said notes, said notes to be subject to redemption prior to maturity at the option of the Executors of said Estate as a whole at any time or in part on any interest payment date or dates in the manner and upon the notice provided for in the indenture attached hereto, upon payment of the principal thereof and accrued interest to the date fixed for the redemption thereof, plus a premium equal to that percentage of such principal amount applicable to such date in accordance with the following schedule, (wherein all dates are inclusive) namely:

From date of issue to and including Nov. 1, 1929_____ 2%
From Nov. 2, 1929 to and including Nov. 1, 1930_____ 1½%
From Nov. 2, 1930 to and including Nov. 1, 1931_____ 1%
From Nov. 2, 1931 to and including Nov. 1, 1932_____ ½%
From Nov. 2, 1932 to and including Oct. 31, 1933_____ 0%

said notes to be issued under and to be subject to the terms and provisions of a proposed indenture between the Executors and Title Insurance and Trust Company, a copy of which said indenture is attached hereto marked "Exhibit A" and made a part hereof, * * *

It Is Further Ordered and Decreed that petitioners, as Executors, are hereby authorized, empowered and directed to execute an indenture between said Executors and Title Insurance and Trust Company in the form attached hereto as "Exhibit A" and said Executors, petitioners herein, are authorized, empowered and directed to make each and all of the covenants and agreements contained in said indenture, * * * and said petitioners, as Executors of said Estate, are further authorized, empowered and directed to sell said notes, aggregating the face value of Nine Million Five Hundred Thousand Dollars ($9,500,000.00) to Harris Trust and Savings Bank and E. H. Rollins & Sons for the price of ninety-six per cent (96%) of their face or par value, * * * and said petitioners, as Executors, are authorized, empowered and directed to pay all expenses in connection with the loan herein authorized and in connection with the issue of said notes.

Pursuant to the executors' application filed on or about November 2, 1928, the California Commissioner of Corporations issued on November 9, 1928, a permit authorizing the sale of the said notes.

On or about November 15, 1928, as of November 1, 1928, the executors of the estate entered into the trust indenture, in the form approved by the Superior Court in its order of November 14, 1928, with the Title Insurance & Trust Co., trustee, covering the note issue. Pursuant to that indenture the executors covenanted and warranted, inter alia, as to the assets of the estate, that the proceeds from the sale of the notes would be used first to pay all estate and inheritance taxes and approved claims and, second, the balance, if any, for general purposes of the estate, including expenses necessarily incurred in connection with the issue of the notes; that the proceeds from the sale of the notes together with cash on hand (approximately $1,206,000) would discharge all known debts of or claims against the estate; that so long as said note issue, or any part thereof, was outstanding they would not borrow any money or issue any additional notes or evidences of indebtedness except with the written consent of the underwriters, or "pledge, mortgage, *transfer in trust*, or other-

wise encumber or hypothecate any of the assets of the Estate", or, "apply for any order, decree or judgment directing or permitting the distribution or partial distribution of all or any of the assets of the Estate", and that if any application for distribution should be made by others, they would "vigorously resist such application to the full extent permitted by law." The executors further covenanted not to apply for or pay any fees to the executors or to the attorneys of the executors in excess of an annual average amount of $50,000 from May 23, 1927, and that they would furnish the trustee (Title Insurance & Trust Co.) with copies of all reports, accounts, and other documents and papers relating to the estate. Further, the indenture provided for four special funds, i. e., (1) an interest payment fund, (2) a general reserve fund, (3) an interest reserve fund, all of which would be kept by the executors, and (4) a sinking fund, which would be paid to the trustee and could be used solely for the purchase or redemption of said notes.

On November 21, 1928, the executors, in pursuance of said court order, sold to the underwriters notes of the estate having a total face value of $9,500,000, for a net discount of $364,386, and during the years 1929, 1930, and 1931 a total premium of $94,391.27 was paid upon the redemption and retirement of such face value of notes. In connection with the issuance of such notes, the executors incurred expenses in the total amount of $49,368.68, which were duly paid and approved, on accounting, by the Superior Court of Los Angeles County.

In connection with the retirement of the said notes the executors paid expenses totaling $35,262.93.

## OPINION.

The Federal estate tax is measured by the net estate transferred by reason of death and Congress has granted certain specific deductions from the decedent's gross estate, as provided in section 303 of the Revenue Act of 1926, for the purpose of determining the value of the net estate. The question here presented is whether the above mentioned expenditures constituted "administration expenses" within the intendment of subdivision (a) (1) of said section 303.[2]

The facts in this proceeding clearly establish that the estate of Henry E. Huntington was in the process of administration under the laws of the State of California during the entire period of time from the date of decedent's death up to and including the hearing

[2] SEC. 303. For the purpose of the tax the value of the net estate shall be determined—
(a) In the case of a resident, by deducting from the value of the gross estate—
(1) Such amounts for funeral expenses, administration expenses, claims against the estate, * * * as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered, but not including any income taxes upon income received after the death of the decedent, or any estate, succession, legacy, or inheritance taxes;

in this proceeding. During that period of time both the petitioners herein have continuously acted solely in the capacity of executors of the estate under the decedent's will, the provisions of which do not authorize said two executors to also act in the capacity of trustees at any time. The issuance of the said notes, of itself, necessarily continued the estate in process of administration until the notes were redeemed in 1931. A claim against the estate in the amount of $816,825.96 for additional income taxes on the decedent's income prior to death was pending until finally settled and paid in November 1933, as hereinafter more fully set forth. Furthermore, since December 26, 1929, the correct amount of the Federal estate tax, involved herein, constituting a claim against the estate, has been in controversy between the executors of the estate and the Commissioner. In April 1931 the executors, by amended petition filed in this proceeding, claimed a refund of approximately $2,000,000. In July 1934 the respondent, by amended answer filed in this proceeding, affirmatively claimed a very substantial increase in the estate tax deficiency as originally asserted by him. There are also pending before the Board two proceedings, in which these executors are petitioners, involving claimed income tax deficiencies for the years 1930 and 1932, respectively. It is manifest that the administration of this estate could not have been finally concluded while litigated claims in such large amounts were outstanding against the estate; and this conclusion applies to all of the expenses hereinafter allowed as deductions for administration expenses.

The Superior Court of Los Angeles County, under the jurisdiction of which the estate was being administered and probated under the decedent's will, antecedently authorized and directed, as above set out in excerpts from its order, the executors to issue the notes of the estate at a specified rate of discount, to redeem such notes prior to maturity at specified premium rates, and to pay *all* expenses in connection with the loan, which, to the satisfaction of that court, was "for the advantage, benefit and best interest of the Estate of said decedent."

The Superior Court's authorization as to the note issue, is to be found in section 830 of the Probate Code of California and its predecessor, section 1577a of the Code of Civil Procedure of California. As to the expenses authorized in the court's order, section 900 of the Probate Code of California and its predecessor, section 1616 of the Code of Civil Procedure of California, provide that "The executor * * * shall be allowed all necessary expenses in the care, management and settlement of the estate, * * *."

In our opinion there can be no doubt that the notes were issued in the due course of the administration of the estate and as a necessary part thereof. The issuance of such notes constituted merely the sub-

stitution of one large obligation of the estate for those then outstanding, including estate and inheritance taxes, allowed claims against the estate, and administration expenses to be paid out of the proceeds of such loan. The issuance of the notes avoided the necessity of sacrificing the assets of the estate by immediate or forced sale of the same, or any part thereof, and the expenditures properly incident thereto were clearly made for the purpose of preserving and preventing waste of the estate, which, as was said in *Brown* v. *Commissioner*, 74 Fed. (2d) 281, was "one of the first obligations of an executor."

In our opinion the discount and redemption premiums at specified rates antecedently authorized by the order of the Superior Court on November 14, 1928, and actually paid by the estate in the amounts of $364,386 and $94,391.27, respectively, and the note issuance and redemption expenses also antecedently authorized by the same order and paid in the amounts of $49,368.68 and $35,262.93, respectively, constituted proper "administration expenses * * * allowed by the laws of the jurisdiction * * * under which the estate is being administered", and, accordingly, are properly deductible from the decedent's gross estate. While there has not been cited by either party, nor have we found, any estate tax case involving directly similar expenditures, the principle of law is the same as that involved in numerous prior decisions in estate tax cases. Cf. *Brown* v. *Commissioner, supra; Bourne* v. *United States,* 2 Fed. Supp. 228; *John F. Degener, Jr., et al., Executors,* 26 B. T. A. 185; *Irving Bank-Columbia Trust Co. et al., Executors,* 16 B. T. A. 897; *Georgette Goldschmidt et al., Executors,* 14 B. T. A. 1010.

### *Issue No. 6.—Additional Administration Expenses.*

#### FINDINGS OF FACT.

This issue involves claimed deductions, totaling $325,049.21, as shown by stipulations Nos. 12 and 13, as additional administration expenses paid or incurred subsequent to the mailing of the deficiency notice except for the amount of $24,851.58 paid or incurred prior thereto. By reference there is included herein stipulation No. 12, which sets forth all of the facts with regard to expenses of certain income tax litigation and stipulation No. 13, which sets forth the facts in connection with the other expenses paid or incurred by the executors. The latter stipulation was supplemented by oral testimony.

The Commissioner determined income tax deficiencies totaling $816,-825.96 on the income of the decedent for the taxable years 1925 and 1926 and the period ended May 23, 1927, and in the proceeding, Docket

No. 45429, brought by the executors of the decedent's estate, this Board redetermined a total deficiency of $479,522.07 for those years, which principal amount, together with interest in the amount of $189,094.04, was paid on November 2, 1933, by the executor in pursuance of the Board's final order in that proceeding.

By stipulation No. 1 the parties have agreed that the estate is entitled to a deduction in the amount of $490,946.63 principal and interest on account of such income taxes (as stated at the outset of this opinion) and by stipulation No. 12 such amount consists of $479,522.07 principal amount of the deficiency in income taxes plus $11,424.56 interest thereon to the date of the decedent's death.

In connection with the litigation of the said income tax deficiencies proposed by the Commissioner, the petitioners herein, as executors of the decedent's estate, incurred various expenses, including attorneys' fees and other charges totaling $72,669.99, which, except for a balance of $11,816.28 paid in the fall of 1933, was paid during 1932 prior to the executors' payment of the above mentioned income tax deficiency of which the respondent has stipulated that $490,946.63 principal and interest is a proper deduction from the gross estate. Such expenditures totaling $72,669.99 were approved by the probate court upon accounting by the executors. The respondent has not allowed any part of such expenditures as a deduction from the gross estate.

Attached to stipulation No. 13, as part thereof, exhibit A consists of 10 pages of itemized expenditures made by the executors from the date of the beginning of the administration of the estate up to September 18, 1935. Such amounts, totaling $153,739.56, have been paid by the executors and approved by the probate court. The uncontradicted testimony of an officer of the corporate executor, the Security-First National Bank of Los Angeles, is that such expenditures pertained solely to the administration of the decedent's estate. In determining the deficiency in controversy herein, the respondent has allowed as a deduction from the gross estate the total amount of $44,651.75 of the amounts listed in said exhibit A.

The *statutory* attorneys' fees amount to $499,463.53, of which $350,000 has been paid and approved by the probate court, and of which the respondent has allowed $427,817.82 as a deduction from the gross estate. The *statutory* executors' commissions amount to $499,463.52, of which $400,000 has been paid and approved by the probate court, and of which the respondent has allowed $427,817.82 as a deduction from the gross estate. The uncontradicted testimony is that the unpaid portions of such statutory attorneys' fees and executors' commissions, in the amounts of $71,645.71 and $71,645.70, respectively, disallowed by respondent, will in due course be paid and, as a matter of general practice and procedure, be approved by the probate court.

## OPINION.

. The litigation expenses totaling $72,669.99 were incurred in the defense of an asserted claim against the estate for income taxes of the decedent, which claim has been finally settled and paid by the executors. In our opinion said expenses totaling $72,669.99 constituted proper "administration expenses", deductible from the decedent's gross estate. Cf. *Florence Grandin*, 16 B. T. A. 515; *James C. Ayer et al., Trustees*, 26 B. T. A. 9; *John A. Loetscher et al., Executors*, 14 B. T. A. 228; reversed on another point, 46 Fed. (2d) 835.

The respondent has allowed as a deduction only $44,651.75 of certain items of administration expenses paid in the total amount of $153,739.56 and approved by the probate court. Clearly, the balance of such administration expenses in the amount of $109,087.81 constitutes an allowable deduction from the decedent's gross estate, including those expenses apparently attributable to the litigation over the estate tax in controversy in the instant proceeding. *John A. Loetscher et al., Executors, supra.* Cf. *Estate of Julius C. Lang*, 34 B. T. A. 337.

The difference between the statutory attorneys' fees and executors' commissions and the amounts allowed as deductions by the respondent on account thereof, or $71,645.71 and $71,645.70, respectively, now claimed by petitioners, constitutes proper "administration expenses, * * * allowed by the laws of the jurisdiction * * * under which the estate is being administered", and thus are proper deductions from the decedent's gross estate. *Bourne* v. *United States, supra; John F. Degener, Jr., et al., Executors, supra; Allie E. Nicholson*, 21 B. T. A. 795; *Irving Bank-Columbia Trust Co. et al., Executors, supra; Georgette Goldschmidt et al., Executors, supra; Estate of Jacob Voelbel*, 7 B. T. A. 276; *James D. Bronson et al., Trustees*, 7 B. T. A. 127; affd., 32 Fed. (2d) 112.

None of the cases cited by respondent as opposed to the allowance of any of the above claimed deductions, involved in issues Nos. 5 and 6, as administration expenses and in support of his contention that they are deductible, if at all, from the gross income of the estate and not from the gross estate, are controlling or persuasive in the instant case.

All the cases cited,[3] except the *Jackson* case, involved claimed deductions from gross incomes of estates on account of expenditures made by the executors or trustees of such estates in the respective years for which the returns were made. The deductions were allowed by the Board either on the ground that, under the provisions of the will, they were specifically or impliedly authorized to be paid out of

[3] *Grace M. Knox et al., Executors*, 3 B. T. A. 143; *William W. Mead et al., Executors*, 6 B. T. A. 752; *H. Alfred Hansen, Executors*, 6 B. T. A. 860; *Julius Bendheim, Executor*, 8 B. T. A. 158; *George W. Seligman, Executor*, 10 B. T. A. 840; *Thomas H. Franklin et al., Executors*, 11 B. T. A. 148; *Charles Lesley Ames, Executor*, 14 B. T. A. 1067; *Florence Grandin*, 16 B. T. A. 515; *Margaret B. Sparrow et al., Trustees*, 18 B. T. A. 1; *Marion M. Jackson, Executor*, 18 B. T. A. 875.

the income of the estate or on the ground that they were business expenses incurred by trustees, acting as such under the provisions of the will, or by executors acting in the capacity of trustees during a period after the time when, in usual and proper course, the administration should have been closed. The *Jackson* case was one in which deductions of expenditures of a somewhat similiar character were claimed by the executor, as such, from the gross estate and the deduction was disallowed by the Board on the ground that in making such expenditures the executor was acting in the capacity of a trustee rather than in that of executor. The instant case is not such a one as is presented in any case so cited by respondent. The will of decedent makes no provision, express or implied, for the executors to act as trustees, nor does it provide for any of the expenditures involved to be paid out of the income of the estate. Neither were the executors acting in the capacity of trustees by reason of the expiration of a time within which, in the usual course, the administration should have been closed, because the facts show, as hereinabove stated, that, during all the times when the expenditures were made, there were outstanding litigated claims against the estate in such large amounts as precluded the closing of the administration in due and proper course.

The respondent also contends that the expenses incurred by the executors after November 21, 1931, should not be allowed in any event because on that date the statute of limitations would have barred his issuance of a deficiency letter and that, necessarily, he could not have considered in his final determination, even if made on that date, any expenses incurred subsequent thereto because they were not then in existence.

In support of this contention the only authorities cited by respondent are *Braun* v. *Lewellyn*, 38 Fed. (2d) 477, and *Ordway* v. *United States*, 37 Fed. (2d) 19. In each of these cases the executor filed suit in the proper Federal court for a refund of estate taxes claimed to have been illegally collected, and a question presented in each case was whether or not the claim for a refund had been filed with the Commissioner of Internal Revenue prior to the running of the statute of limitations against such filing. The holding in each case was to the effect that the claim for refund had not been so filed and that consequently the plaintiffs were not entitled to the refund sought. It is obvious that neither the *Ordway* nor the *Braun* case affords any support for this contention of respondent. Here we do not have any issue involving the statute of limitations, the running of which has been suspended by the timely filing of the petition initiating this proceeding. We find no merit in this contention of the respondent.

Reviewed by the Board.

*Decision will be entered under Rule 50.*