Estate of Albert Patterson Humphrey, Deceased, Joe A. Humphrey, Temporary Administrator, v. Commissioner.
Estate of Albert Patterson Humphrey v. Commissioner
Docket No. 5430.
United States Tax Court
1946 Tax Ct. Memo LEXIS 288; 5 T.C.M. (CCH) 34; T.C.M. (RIA) 46018; January 18, 1946
*288 R. B. Cannon, Esq., for the petitioner. Homer J. Fisher, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In this proceeding petitioner estate contests respondent's determination of a deficiency in estate tax of $43,028. Petitioner's decedent, Albert Patterson Humphrey (hereinafter referred to as decedent), died on February 23, 1942. Respondent, in his notice of deficiency, asserts as the bases for his deficiency determination four grounds: (1) that within two years of decedent's death, he and his wife made cash gifts from community property to their two sons aggregating $80,000, and that the gifts by decedent were made in contemplation of death and had a fair market value at the date of his death of $40,000; (2) that decedent's 25 percent interest in the partnership of Joe A. Humphrey Company had a fair market value of $261,022.01 at the time of his death instead of $185,475.72 as reported; (3) that attorneys' fees, estimated in the amount of $2,000 on the return, were not deductible, as there had been no administration of the estate; (4) that certain deductions claimed on the return as debts of the decedent which covered deficiency *289 income taxes, penalties, and interest thereon, all of which are in litigation, were subject to disallowance, as the correct amount of the obligations was not ascertainable. Petitioner having waived an issue raised in its petition, and the parties having stipulated as to the items covering deficiency income taxes, penalties, and interest, that the amounts determined by this Court in the proceedings styled "Albert Patterson Humphrey, Deceased," Docket No. 4641, [1] be the amounts deductible under point 4 above, three issues remain: (1) whether the gifts were made in contemplation of death; (2) the fair market value of decedent's interest in Joe A. Humphrey Company, the partnership, the difference arising primarily over the value to be placed on the so-called Mosier lease, the partnership's principal asset, and (3) the amount of attorneys' and accountants' fees allowable as administration expenses. Findings of Fact The decedent was born on September 16, 1860. He had not been active in any business for some time prior to 1911. He died on February 23, 1942, at the age of 81 years; he was a resident of the State of Texas *290 since 1916. The estate tax return was filed with the collector for the second district of Texas. Option to value the estate as of the date of death was elected. The causes of his death, listed on the death certificate, were as follows: The primary cause of death
was: Primary anemia
duration 12 years
Contributory causes were: Myocardial failure
duration 4 months
Cerebral and coronary
sclerosis
duration 15 years
The certificate was signed by Dr. Wilfred J. Allison, who certified thereon that he attended decedent from January 15, 1941, to February 23, 1942. On the estate tax return, in response to the question "Cause of death and length of last illness," the answer is given "Heart Disease"; in response to the question "Names and addresses of decedent's physicians," the answer is given "Drs. Shuey and O'Brien, Medical Arts Building, Dallas, Texas." In 1924 decedent was operated on for an indirect inguinal hernia by Dr. Doolittle at Baylor Hospital in Dallas, and upon its recurrence he was operated on again, possibly in 1933. In 1928, decedent was hospitalized with an ailment which was diagnosed as pernicious anemia; treatment was undertaken, and decedent *291 took liver extract for this condition. From 1928 to 1936 decedent was attended by Dr. William H. Potts. Decedent was examined in 1931 by Dr. Harold A. O'Brien and was found to have a mild infection of the prostate. He was examined again by Dr. O'Brien in 1941, when decedent was hospitalized from March 3 to March 14, and his condition was diagnosed as benign prostatic hyperthrophy and cystitis; surgery was not undertaken, as Dr. O'Brien did not believe that decedent needed it. In March, 1941, Dr. Charles B. Shuey, at the request of Dr. Allison, who had rendered medical services to decedent since early in January, 1941, and was not himself available, made visits to decedent at his home, and from that time until the date of decedent's death made 36 home visits, some of which were only for the purpose of administering liver extract. From May 29 to June 7, 1941, decedent was hospitalized under the care of Dr. Shuey, and his condition was diagnosed as pernicious anemia, chronic prostatitis, ascending infection, cystitis, pyelitis, arteriosclerosis, hypertension. In November, 1941, decedent suffered a heart attack, from which he did not recover. For at least ten years prior to his *292 death, decedent made pleasure trips to California, his last such trip being shortly after the making of the gifts in question. In 1927, Joe A. Humphrey, decedent's son, and Anne P. Humphrey, decedent's wife, became associated in the oil business, decedent's wife contributing the initial capital of $2,500 in cash. On January 15, 1931, a new partnership agreement was executed, and Layton Humphrey, brother of Joe, who had just completed his schooling, was admitted into the partnership, called Joe A. Humphrey Company. Decedent was made a party to this agreement upon the advice of counsel because of his community interest in the property. The agreement provided as follows: PARTNERSHIP AGREEMENT THIS AGREEMENT OF PARTNERSHIP entered into by and between JOE A. HUMPHREY, hereinafter known as the party of the First Part, and MRS. A. P. HUMPHREY, A. P. HUMPHREY, and LAYTON HUMPHREY, hereinafter known as the parties of the Second Part: WITNESSETH: That this partnership is for the purpose of conducting a business of buying and selling oil payments, oil leases and royalties. The partnership will be known as JOE A. HUMPHREY COMPANY; It is understand [sic] and agreed that Joe A. Humphrey *293 is to have complete charge of any and all transactions that are to take place; Joe A. Humphrey is to sign all checks, and handle all funds and moneys paid into the partnership. It will be up to Joe A. Humphrey to pay all salaries in amounts, to any and all other partners in the partnership as he sees fit. All the profits are to stay in the business until Joe A. Humphrey sees fit to pay dividends. * * * * *
Thereafter decedent and his wife were each treated as having a 25 percent interest in this partnership and each of their sons, Joe and Layton, also had a 25 percent interest. Neither decedent nor his wife took any active part in the partnership operations. In each year from 1931 to 1940, inclusive, a share of the income from Joe A. Humphrey Company was reported on the Federal income tax returns of decedent and a portion was shown as reported by his wife on each return except the one for 1932. Decedent's returns for the years 1933 and thereafter show that they were prepared by H. Lichenstein, the 1934 return stating that it was from information taken from partnership books which he kept. No income was reported by decedent on these returns from any other source than *294 the Joe A. Humphrey Company. Likewise decedent's wife reported income from no other source during the years 1931 to 1941, inclusive. Decedent himself signed his income tax returns for the years 1931 to 1936, inclusive. His 1937 return was signed by Joe A. Humphrey as agent and was subscribed and sworn to on March 12, 1938. Decedent's 1938 return was signed by J. A. Humphrey as agent, and was subscribed and sworn to on March 14, 1939. Decedent himself signed his 1939 return. It was sworn to on March 15, 1940. Decedent's 1940 return was signed by J. A. Humphrey as agent. It was subscribed and sworn to by him on March 10, 1941, in Dallas, Texas. At the suggestion of Joe Humphrey a joint will was executed on February 8, 1938, by the four members of the Joe A. Humphrey Company. This followed a discussion that Joe Humphrey had with his mother and decedent regarding the disposition of the partnership properties if any of the partners should die. The first party to the will was decedent and he bequeathed his one-fourth undivided interest in the partnership properties, one-half to his sons, Joe and Layton, share and share alike, or to the survivor of them, and one-half to his three daughters, *295 share and share alike, or to the survivor of them. The will provided, however, that the bequests to Layton and the three daughters should be subject to the control of Joe Humphrey under a trust established by the last paragraph of the will. Decedent's wife made identical disposition of her one-fourth undivided interest in the partnership properties. Layton Humphrey bequeathed his one-fourth interest to his brother Joe and his three sisters, share and share alike or to the survivor of them, subject to the control of Joe Humphrey under the powers given him by the last paragraph of the will. Joe Humphrey bequeathed his one-fourth interest to his wife, Laura, and his three sisters, share and share alike, or to the survivor of them, with the request that they leave the properties intact and permit his brother Layton to manage them. The joint trust created under the last paragraph of the will, of which Joe Humphrey was the trustee, to continue for his lifetime with full and complete powers of management of the properties and complete discretion as to whether or not any income accruing from the properties should be paid out to the beneficiaries. At the date of the execution of the *296 will none of the joint testators owned any property of consequence other than the partnership interest in Joe A. Humphrey Company. The will was probated as to decedent in December, 1944, and Joe Humphrey was named executor. Joe A. Humphrey Company prospered and at the beginning of 1941 the company's net worth was about $463,000 based on cost, not actual value, of its assets. The annual income which decedent and his wife received as their share from the company as reported by decedent on his income tax returns from 1937 to 1940 is as follows: 1937
$72,753.77
1938
52,529.04
1939
28,568.99
1940
42,694.16 *
Early in 1941 Joe and Layton Humphrey considered the formation of an additional partnership in which only they two would have any interest. Articles of partnership agreement were drawn sometime later but dated as of January 1, 1941, and the partnership known as Humphrey Brothers was thereby formed. The amount of capital of this partnership was left blank in the agreement and was inserted in ink sometime in early 1945 as being $160,000. Prior to the formation *297 of Humphrey Brothers, Joe Humphrey discussed the matter of its formation with his mother and informed her that he and Layton each planned to draw out of Joe A. Humphrey Company $40,000 for the purpose of providing capital for Humphrey Brothers; he suggested to her that she and decedent each also draw a similar amount, and, since they had no particular use for the money, turn it over to him and Layton as gifts, which sums would be used as additional capital for Humphrey Brothers. His mother and decedent assenting, on January 18, 1941, Joe Humphrey drew four checks on J. A. Humphrey, Trustee Account, the bank account used by Joe A. Humphrey Company, each check being in the amount of $40,000 and payable one each to the four partners. These checks were endorsed on the same date. Until they were deposited to the credit of Humphrey Brothers on May 20, 1941, they were in the custody of Joe Humphrey and were locked in a drawer in his desk. The check payable to Mrs. A. P. Humphrey, decedent's wife, was endorsed by her "Pay to order of J. A. Humphrey" and was then endorsed by the latter. The check payable to A. P. Humphrey, the decedent, was endorsed "Pay to the order of Layton Humphrey. *298 " These words were written by decedent's wife, with decedent however writing his own signature. Layton Humphrey's name was endorsed thereon by J. A. Humphrey. The check payable to Layton Humphrey was likewise endorsed for him by J. A. Humphrey. The check payable to J. A. Humphrey was endorsed by J. A. Humphrey. At the time the checks were drawn Joe Humphrey knew that the specific exemption for Federal gift tax purposes was $40,000. The $160,000 proceeds of these checks constituted the capital of Humphrey Brothers and the books of the latter were not opened until the date of deposit of the checks. At or about the time the checks were drawn Joe Humphreys, acting on behalf of Humphrey Brothers, paid $5,000 for an option to purchase an interest in certain oil properties in Louisiana, which option was not required to be exercised, and was not exercised, until after an examination of sands from a well being drilled on the property, all of which took place some months later. Humphrey Brothers invested approximately $115,000 of its capital in Louisiana oil and gas leases and loaned to Joe A. Humphrey Company the sum of $45,885.16, which was not needed in its own operations. On May 21, 1943, the *299 Federal estate tax return of decedent was filed, signed and sworn to by J. A. Humphrey, as executor in which was reported a total gross estate in the amount of $185,500.72, composed of an oil royalty valued at $25 and of decedent's 25 percent interest in the Joe A. Humphrey Co. valued at $185,475.72. Deductions claimed amounted to $21,802.38. Respondent has determined the net worth of the Joe A. Humphrey Company at the date of decedent's death as being $1,019,807.23 and the value of decedent's 25 percent interest therein as being $261,022.01. Respondent has increased the value of various assets of the company, including the Mosier lease. Petitioner contests only the increase assigned to the Mosier lease. The value of the decedent's gross estate, inclusive of the $40,000, transfer of which respondent has determined was made in contemplation of death, and of an undivided one-half interest in a certain residence valued at $5,000, as determined by respondent, has been increased to $306,047.01. In response to the inquiry on sheet II of the estate tax return as to the cause of death and length of last illness, the only answer given is "Heart Disease." No answer appears to the following *300 inquiry: "If decedent was confined in a hospital during his last illness, give name and address of hospital." Decedent's widow is still living. In reporting the value of decedent's interest in Joe A. Humphrey Company, Joe Humphrey reported as one of the assets of the company the Mosier lease at a value of $225,000. Respondent determined the value of this lease at time of decedent's death at $450,000, at the rate of $50,000 per well for the nine wells on the tract. The Mosier lease covers an area of 23 and a fraction acres in the East Texas oil field, and there is drilled thereon a well to each 2.6 acres. J. S. Hundall, petroleum geologist and valuation engineer, in March or April, 1943, at the request of Joe Humphrey, made an appraisal of the Mosier lease and estimated its reasonable market value as of February, 1942, at $361,331, using a discount factor of 12 percent and estimated net income for the first ten years as $44,973 per year. From October, 1941, to March, 1942, the net income of the lease was at a rate of $54,000 per year. In valuation engineering a 10 percent variation in appraisals is recognized as reasonable and as not affecting the soundness of the result. *301 A. B. Irion sold to General American Oil Company on February 20, 1942, a one-acre lease with one producing well thereon subject to a one-sixteenth overriding royalty outstanding, located in the East Texas oil field for $32,000. On a comparable basis, the well in question, if located on 2.6 acres, would have brought about $40,000 for a seven-eighths working interest. This lease is not as favorably located as the Mosier lease, and its sand thickness not as great. Charles Pettit sold to the General American Oil Company in November, 1941, two different leases, one improved with three wells in which the purchaser required approximately a two-thirds interest, the other improved with eight wells. The consideration was $50,000 a well, payable $10,000 in cash and $40,000 in non-interest-bearing notes due within ten years. The three-well lease was comparable to the Mosier lease; the eight-well lease was not as good. Atlantic Refining Company purchased from the Venezuela Oil Company in September, 1941, 10.53 percent interest in three tracts, in which it already had substantial interests, for the sum of $130,000, which amount was allocated among the three tracts by the purchaser as follows: *302 Lease
Acreage
Wells
Allocation
Bell Walker
123.5
21
$30,000
Callie Jones
40.34
13
70,000
Tuttle, B.
25
6
30,000
In connection with the administration of decedent's estate, Joe Humphrey, in his representative capacity, has incurred attorneys' fees of $1,500 for services rendered in the instant proceeding. Attorneys' fees for the probate of decedent's estate have been incurred, for which petitioner is liable to the extent of $250. Accountants' fees have been incurred in the preparation of decedent's estate tax returns and in preparing for this proceeding, but these are not claimed in the petition. The accountants, who also have rendered services for Joe Humphrey, personally, have been paid by him $1,000, but the amount thereof, if any, attributable to services rendered petitioner, has not been determined by Joe Humphrey or by the accountants. Decedent transferred by gift in January, 1941, the sum of $40,000 in contemplation of death. The value of the Mosier lease at the time of decedent's death was $400,000. The amount of attorneys' fees deductible as expenses of administration is $1,750. Opinion 1. That the $40,000 gift to decedent's *303 sons was made in contemplation of death follows not only from petitioner's failure to overcome the prima facie correctness of respondent's determination and the statutory presumption, [2] but equally effective from the surrounding circumstances, such as decedent's age and physical condition, the method of effecting the gift, the donor's apparent indifference to details, the amount of the transfer, and its unique and unprecedented character in the history of decedent's relations with his family. Even if, as petitioner insists, the check endorsed by decedent's wife was her act and not his, or her purpose would be imputable to him, and his acquiescence, cf. 13 Vernon Civ. Statutes (Tex.), art. 4619, would have the consideration already described equally operative. See City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594. Respondent's determination that the transfer was made in contemplation of death is sustained. 2. The controversy as to value is disposed of by the finding that the property in issue was worth $400,000. This is our conclusion drawn after weighing "all of the relevant facts, including *304 comparative sales and all the various other factors affecting market value" and after giving consideration "to the expert opinions of value as testified to by the * * * witnesses * * * in light of their particular qualifications, their knowledge of the actual facts * * * and their particular methods of valuation." Estate of Henry E. Huntington, 36 B.T.A. 698, 705. 3. The full amount of attorneys' fees claimed by petitioner has been found to be allowable. Nothing can be added to this figure for payment to accountants. Even if the expense properly allocable for the estate's share had been shown, which it was not, nothing was claimed for this item in the petition. Arthur W. Bingham, Executor, 15 B.T.A. 1001. Decision will be entered under Rule 50. Footnotes
1. Decided by memorandum opinion simultaneously herewith.↩
*. Taxable income for 1940 is an issue to be determined by the decision in Docket No. 4641.↩
2. Internal Revenue Code, section 811(c)↩.