Estate of Reuben J. Freed, Deceased, Quakertown Trust Company, Executor v. Commissioner.
Estate of Reuben J. Freed v. Commissioner
Docket No. 6898.
United States Tax Court
1947 Tax Ct. Memo LEXIS 291; 6 T.C.M. (CCH) 216; T.C.M. (RIA) 47048; February 27, 1947
Early L. Gilbert, C.P.A., Lansdale, Pa., for the petitioner. Robert H. Kinderman, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined a deficiency in estate tax in the amount of $9,626.36. The deficiency results from several adjustments made by the respondent, several of which are not in issue. The only questions presented for determination are as follows: (1) The value at the date of the death of the decedent of 190 *292 shares of common stock of Quakertown Water Company. (2) The value at the date of the death of the decedent of certain shares of installment stock of building and loan associations. (3) The amount of the allowable deduction for executor's fees. (4) The amounts to be deducted for certain bequests of remainder interests to charities. The estate tax return was filed with the collector for the first district of Pennsylvania. Issue I. The Value of 190 Shares of Common Stock of Quakertown Water Company Findings of Fact Petitioner, Quakertown Trust Company, is the executor of the estate of Reuben J. Freed, deceased. The decedent died, testate, on October 18, 1940, a resident of the Borough of Quakertown, Bucks County, Pennsylvania. Included in the assets of the estate were 190 shares of common stock of Quakertown Water Company. The executor reported this stock in the estate tax return at a value of $28 a share, or a total of $5,320. Respondent determined that the fair market value of the stock at the date of the decedent's death was $200 a share, or a total of $38,000. Quakertown Water Company was incorporated April 10, 1893, in the Commonwealth of Pennsylvania, to engage in the *293 business of supplying water to the Borough of Quakertown. During all of the years in question its outstanding stock consisted of 1,282 shares of common stock of $25 par value. The decedent became president of the company around 1918. He became majority shareholder at or about that time and remained both president and majority shareholder until 1937. On December 11, 1937, he sold 640 shares of stock to his nephew, C. William Freed, who then became the majority shareholder. C. William Freed had owned 80 shares of stock before, so that after December 11, 1937, he owned around 720 shares. C. William Freed had been secretary of the Company since 1910. He succeeded his uncle as president around June, 1937. In 1940, C. William Freed was both president and treasurer of the Water Company, and his son, Howard B. Freed, was secretary. On the date of the death of the decedent, October 18, 1940, the stock of the Water Company was held as follows, approximately: Estate of Reuben J. Freed
190 shares
C. William Freed
688 shares
Other members of the Freed family
155 shares
Persons not members of Freed
family
249 shares
Total
1,282 shares
According to the balance sheet *294 of Quakertown Water Company as of December 31, 1940, as taken from its books, the assets and liabilities of the Water Company were as follows: ASSETS
Fixed Capital: Installed prior to January 1, 1918
$ 93,227.92
Installed since December 31, 1917
127,810.47
$221,038.39
Garage Building
2,100.00
Fund Accounts: Quakertown Building and Loan
22,150.00
Current Assets: Cash
7,824.10
Accounts Receivable
5,476.66
13,300.76
Prepaid and Accrued Assets: Prepaid Insurance
118.98
Water Revenue Accrued
3,191.61
3,310.59
Unamortized Bond Expense
2,551.73
Total Assets
$264,451.47
LIABILITIES
First Mortgage 5% Bonds
$ 70,000.00
Accounts Payable
449.15
Accrued Liabilities: Unmatured Interest on Bonds
$ 291.67
Taxes Accrued
1,457.93
Water Revenue Collected in Advance
391.73
2,141.33
Reserves: Reserve for Depreciation
82,481.72
Reserve for Uncollectible Accounts
2,461.49
84,943.21
Capital: Common Stock (1,282 shares)
32,050.00
Premium Paid on Stock
400.00
Surplus
$73,797.34
Net Income year ended
12/31/40
$2,593.44
Less Dividends Paid
1,923.00
670.44
74,467.78
106,917.78
Total Liabilities and Capital
$264,451.47
*295 The earnings of the Company available for distribution as dividends for the years 1935 through 1940 were as follows: 1935
$5,895.00
1936
5,696.32
1937
3,252.47
1938
3,466.52
1939
2,628.38
1940
2,593.24
Average earnings of the Water Company per share were $2.02 in 1940 and $2.75 for the five years which ended December 31, 1940. Out of these earnings, the corporation regularly paid dividends of 6 percent per year or $1.50 a share. On January 19, 1935, officials of the Borough of Quakertown first discussed the possibility of its acquisition of the Water Company with George F. B. Appel, of Townsend, Elliott & Munson, Philadelphia attorneys, who later represented the Borough in connection with the creation of the Quakertown Borough Authority and other matters. In about 1937 or 1938 the officials of the Borough approached C. William Freed about the prospect of the Borough's purchasing the physical assets of the Company. He did not want to sell but agreed that if Francis Friel, of Albright & Friel, consulting civil engineers, made an appraisal that was fair to him and to the Borough he would sell upon the basis of such appraisal, subject to its being reviewed *296 by another engineer. Accordingly, the Borough hired Friel on February 17, 1938, to make the appraisal, after he had estimated that the cost of making the appraisal would be $3,000. As of August 1, 1938, Friel appraised the physical assets of the Water Company on the basis of reproduction cost new less accrued depreciation at $279,819.92. On April 19, 1939, the Borough Council offered C. William Freed $270,303.95 for the physical assets of the Water Company. On September 6, 1939, it raised that offer to $300,000. At the time of the second offer, the Borough Council instructed the Borough Solicitor to draw up the necessary papers for the formation of a Borough Authority to buy and operate the Water Company if a price could be agreed upon. C. William Freed rejected both offers as insufficient. Freed hired Craig, an engineer, to review Friel's appraisal. Craig appraised the physical assets of the Water Company at $320,000. In 1939 or 1940, before the death of the decedent, the Borough Solicitor told C. William Freed that if he did not sell the water plant to the Borough it would be taken by condemnation. The decedent knew of this possibility. On October 17, 1940, Appel, the attorney, *297 wrote a letter to the Solicitor in which he outlined the steps by which a Borough Authority might be formed and the property might be purchased. The decedent died on the day following the date of this letter. Shortly after the death of the decedent, it became clear that an agreement would soon be made for the sale of the Water Company. On November 6, 1940, the Borough repeated its offer of $300,000 to C. William Freed. Then, for the first time, Freed made a counter offer of $315,000. When the Borough Council learned of this, it adopted an ordinance on November 15, 1940, for the establishment of a Borough Authority, which was duly incorporated and had its first meeting in December, 1940. Francis Friel brought his appraisal of the physical assets of the Company up to date. As of January 1, 1941, he appraised the assets on the basis of reproduction cost new less accrued depreciation at $299,206. The Borough Authority proceeded to draw up an agreement to cover the acquisition of the Water Company stock in January, 1941. At a meeting on January 3, 1941, of the Authority, a proposed draft of an agreement with Freed was considered and a resolution was passed authorizing the officers *298 of the Authority to execute and deliver the agreement. The draft agreement provided that $315,000, less the appraised value of certain land was to be paid for all of the outstanding stock of the Water Company. It also provided that out of the purchase price of the stock, Freed would pay $75,200 to the Quakertown Trust Company to cover all outstanding indebtedness of the Water Company, which included $70,000 of bonds secured by mortgage. The agreement was subject to the conditions that all of the stock should be delivered to C. William Freed and through him to the Authority, and that bonds issued by the Authority to pay for the stock should be sold. This proposed agreement was not executed. However, at a meeting of the Board of the Authority on March 25, 1941, a revised draft of an agreement with Freed was approved. An agreement to final form was executed by Quakertown Borough Authority and by C. William Freed on behalf of himself and the other shareholders on April 25, 1941. Under the agreement the Authority agreed to pay $310,700 for the delivery of all 1,282 shares of outstanding stock of the Quakertown Water Company. The Authority was to receive a release of the mortgage. The stockholders *299 represented that the liabilities of the Company were and would continue to be the same as of December 31, 1940, except for changes in the ordinary course of business. The Water Company stock was to be delivered to the Borough through deposit of all of the shares with C. William Freed as trustee or the Merchants' National Bank of Quakertown as trustee. The date for the closing under the agreement was June 10, 1941. The agreement of April 25, 1941 provided that settlement should not be completed unless all of the stock of the Company was delivered and unless enough of the Authority's bonds were issued to finance the settlement. As majority stockholders and president of the Water Company, C. William Freed conducted all negotiations with the Borough Council and the Borough Authority. At the time of the closing under the contract of April 25, 1941, he owned 878 shares of the Water Company stock. Members of his family owned a large part of the remaining shares and followed his advice. The Borough had originally sought to buy the physical assets of the Company. C. William Freed required thatit buy the stock instead, so that taxation on a gain upon the sale might be avoided. On October 18, 1940, the *300 decedent, Reuben J. Freed, died, His will provided that $140,000 should be held in trust for his wife for life and then distributed among certain remaindermen, including members of his family. C. William Freed's share in the remainder was $19,000. The will also provided that C. William Freed should have the right to buy all or as much of the Quakertown Water Company stock which the decedent possessed at the time of his death as C. William Freed might desire, at $28 a share. C. William Freed exercised this right. He purchased 190 shares of the stock at $28 per share from the estate on March 14, 1941. Thereafter he owned 878 shares of the Water Company stock. There was no market for the stock of the Water Company from the year 1935 down to the date of the closing of the sale to the Authority. There were very few sales of shares of the stock during that period. A few purchases were made by the decedent and C. William Freed, when stockholders desired to dispose of their stock. The fair market value on October 18, 1940, of 190 shares of stock of Quakertown Water Company was $200 per share, or $38,000. Opinion The question for determination is the fair market value of 190 shares *301 of Quakertown Water Company stock, an asset of the decedent's estate, on October 18, 1940, the date of the decedent's death. The executors reported the value of the stock in the estate tax return as $28 per share. On brief petitioners contend for either of two values, $45 per share or not more than $83 per share. The respondent has determined that the value of the stock was $200 per share. The Quakertown Water Company was a family controlled corporation. In October, 1940 and before, about 1,033 shares of stock out of 1,282 shares were owned by members of the Freed family. It appears that the holdings of the remaining 249 shares were scattered and in small lots. The decedent was more than 91 years of age when he died. C. William Freed, a lawyer, was then in active control of the Company, and had been for several years. There was no market for the stock of the Water Company at any time close to the date of the decedent's death; nor had there been any market for the stock for several years before. There is little evidence in this proceeding of sales of the stock during 1940 and before. Such evidence as there is shows that the few scattered transactions in the stock in prior years, 1935 *302 for example, were purchases by the decedent or C. William Freed from small stockholders. It appears that most of the few sales of the stock were made to C. William Freed or to the decedent. The situation relating to the control of the stock of the Company by C. William Freed and members of the Freed family over a period of many years prior to the crucial date of valuation under the issue presented, and the lack of a market for the stock requires that we turn to other criteria than market prices evidencing arms-length transactions in the stock close to the valuation date to ascertain the value of the stock on the date of death. We do not find from the evidence any criteria upon which the value of the stock may be ascertained except the fair market value of the assets underlying the stock. See Estate of Henry E. Huntington, 36 B.T.A. 698, 715, and cases cited therein; Paul, Federal Estate and Gift Taxation, Vol. II, p. 1295, par. 18.33. There is much evidence relating to the value of the physical assets of the Water Company consisting of competent appraisals of the assets which were made at various times beginning in August, 1938.the appraisal which was made after September 6, 1939, by *303 Craig, who was engaged by Freed, appears to have been made about one year before the death of the decedent. He appraised the Company's physical assets at $320,000. As of January 1, 1941, about 2 1/2 months after the date of decedent's death, the appraiser, Freed, reappraised the physical assets of the Company at $299,206. Bona fide offers to purchase the Water Company's physical assets were made by the Borough of Quakertown to Freed which were based upon the appraisals. For example, on September 6, 1939, about a year prior to the date of the decedent's death, the Borough made a firm offer of $300,000, and this offer was repeated on November 6, 1940, less than a month after the crucial valuation date. A short time thereafter, Freed made a counter offer to sell for $315,000. The record includes testimony of expert witnesses in addition to the evidence to which reference has been made above. Consideration has been given to the opinions of value expressed by these witnesses. Careful consideration has been given to all of the evidence. There is no established controlling method for arriving at the value of stock. James Couzens, 11 B.T.A. 1040, 1045, 1165. In each case, *304 valuation of stock is made upon consideration of all of the facts. Zanuck v. Commissioner, 149 Fed. (2d) 714. Giving due consideration to all of the evidence it is concluded that the fair market value of the Water Company stock on October 18, 1940, was $200 per share, and this has been found as a fact. Issue II. Valuation of Building and Loan Stock Findings of Fact At the time of his death, the decedent owned installment stocks of certain building and loan associations. The executor included these stocks in the estate tax return at their cash surrender values. The respondent determined that the stocks should have been included at their book values, which were higher in the case of each holding of stock. The fair market values of the building and loan associations' stocks on October 18, 1940, were as follows: 10 shares Progressive Bldg. & Loan
Assoc.
$ 511.50
7 shares Quakertown Bldg. & Loan
Assoc.
1,125.25
5 shares Quakertown Bldg. & Loan
Assoc.
610.20
5 shares Quakertown Bldg. & Loan
Assoc.
206.00
5 shares Quakertown Bldg. & Loan
Assoc.
141.00
5 shares Progressive Bldg. & Loan
Assoc.
403.75
Opinion Petitioner has not introduced *305 any evidence to overcome the prima facie correctness of the respondent's determination. He cites no authority in support of his position that the cash surrender values of the installment stock of the building and loan associations represented the fair market values of the stock. The burden of proof is upon petitioner to establish the fair market values at the date of death. This petitioner has not done. Under this issue there is failure of proof, and, therefore, respondent's determinations under this issue are sustained. Issue III. Executor's Commissions Findings of Fact In the first and final account of the executor, Quakertown Trust Company, filed in the Orphans' Court the executor claimed and was allowed executor's commissions in the amount of $13,844.17. The value of the personal property passing through the hands of the executor was $279,000.37. The commissions represent approximately 4.9 percent of the value of the personal estate. The $13,844.17 of commissions were paid to the executor by check dated November 14, 1941. Respondent determined that a reasonable allowance for executor's commissions was 3 percent of the value of the personal property administered by the *306 executor and allowed as a deduction the sum of $8,306.50. Opinion The regulations [1] provide that executor's and administrator's fees are properly deductible as a part of the administration expenses under section 812(b). They further provide "the executor or administrator in filing the return may deduct his commissions in such an amount as has actually been paid." It is not denied that the fees in question have been paid, nor does the respondent advance any sound reason why his regulations should not be followed. There is no Pennsylvania statute fixing the percentage rate by which executor's commissions are to be determined. It may be true, as respondent asserts, that the usual rule in Pennsylvania for large estates is that the commissions are usually fixed at 3 percent of the value of the property administered by the executor, but a commission equal to 5 percent of the value of the personal property handled by the executor is not uncommon and is often allowed. See cases cited in In re Young's Estate, 204 Pa. 32; 53 Atl. 511. The executor was an independent fiduciary and the beneficiaries had no interest in allowing *307 commissions to be paid to it except for services actually rendered. Accordingly, we hold the amounts paid are deductible. See Estate of Charlotte D. M. Cardeza, 5 T.C. 202. Issue IV. Charitable Bequests Findings of Fact By will decedent set aside $140,000 for the creation of a testamentary trust. The will provided that the income from the entire corpus was to be paid to the decedent's widow for life and on her death the income of a portion of the corpus was to be paid to two individuals as successor life tenants. On the death of the widow and the successor life tenants the trust corpus, free and clear of the trust, was to be paid inter alia to five charities. The will also provided that $500 of the trust corpus was to be paid on the death of the widow in trust to the Union Cemetery Company for the purpose of keeping the decedent's vault and other improvements on the decedent's cemetery lot in good condition and repair. The gross amounts of the trust corpus payable to the five charities on the dates of death of the life tenants, unreduced by possible charges, taxes, and expenses, were as follows: St. John's Reformed Congregation
$28,571.43
Quakertown Hospital Association
28,571.43
J. Andrew Judd, life beneficiary, with
remainder to Bethany Orphans'
Home
22,857.14
William J. Kirkpatrick, life benefici-
ary, with remainder to Phoebe Dea-
coness & Old Folks' Home
16,000.00
Reformed Congregation
3,428.57
*308 In the estate tax return petitioner claimed deductions for charitable bequests for the value at the date of death of the decedent of the gifts to the five charities and the Union Cemetery Company as follows: St. John's Reformed Congregation
$23,716.36
Quakertown Hospital Association
23,716.36
Bethany Orphans' Home
18,973.10
Phoebe Deaconess & Old Folks Home
13,281.17
Reformed Congregation
2,845.96
Union Cemetery Company
474.33
The amounts claimed as charitable deductions by petitioner did not include any reduction for Pennsylvania state inheritance tax. Decedent's will made no provision with respect to the payment of Federal estate or state inheritance taxes. The respondent adjusted petitioner's computation of present value of the charitable bequests and reduced the bequests by the amount of the 10 percent Pennsylvania state inheritance tax, allowing deductions for charitable bequests as follows: St. John's Reformed Congregation
$18,609.87
Quakertown Hospital Association
18,609.87
Bethany Orphans' Home
14,285.25
Phoebe Deaconess & Old Folks' Home
8,405.77
Reformed Congregation
2,233.19
Respondent disallowed in its entirety *309 the bequest of the $500 in trust to the Union Cemetery Company on the ground the bequest was not a bequest to charity. Opinion On brief petitioner contests only one adjustment made by respondent in arriving at the present value of the five gifts to charity for estate tax deduction purposes. Petitioner claims that the amount of the bequests should not be reduced by the 10 percent Pennsylvania state inheritance tax on the grounds that (1) no tax is due under Pennsylvania law on the bequest of a remainder interest to charity, and (2) if a tax is due, such tax is not payable out of the charitable bequests. There is no merit in petitioner's contention that the charitable bequests, even though of remainder interest, are not subject to the Pennsylvania state inheritance tax. Transfers to charity are subject to the Pennsylvania state inheritance tax unless they are bequests to a chairty which uses the property for free and public exhibition as an art museum or a library. 72 Purdon Pennsylvania Statutes, section 2483. Decedent's will made no provision for the payment of any Federal, estate or state inheritance taxes. Although under Pennsylvania law the inheritance tax on a remainder *310 interest is not due and payable until the remainder vests in possession and enjoyment (72 Purdon Pennsylvania Statutes, section 2304) the tax is payable out of the interest eventually passing to the remainderman. "Unless the will, deed, grant, or gift expressly provides otherwise, the transfer tax is ultimately payable by the legatee, grantee, or donee, or out of the property or estate passing to him." In re Elliott's Estate, 113 Pennsylvania Superior Court 350. Moreover, the Pennsylvania statute provides that if the remainderman wishes to postpone payment of the tax until he comes into actual possession of the bequest, the remainderman must enter into security for the payment of the tax within one year after the decedent's death. Whether or not such security was entered into here, it is evident from the Pennsylvania statute that the amount which will actually pass to the charities will be reduced by the amount of the state inheritance tax. Since section 812(d) of the Internal Revenue Code allows as a deduction only the net amount actually passing for the use of the charity, the respondent's determination limiting the deductions to such amounts is sustained. *311 Harrison v. Northern Trust Co., 317 U.S. 476. On reply brief, petitioner seeks to have the $500 bequest to the Union Cemetery Company treated as a funeral expense deduction under the authority of the Estate of Charlotte D. M. Cardesa, supra. However, the petition does not assign as error respondent's disallowance of the bequest as a deduction, and the issue therefore, is not properly before us. Camp Wolters Land Co., 5 T.C. 336. Decision will be entered under Rule 50. Footnotes
1. Regulations 105, section 81.33.↩