Estate of Ephraim Frank Sobel, Deceased, Louis Midler, Executor v. Commissioner.
Estate of Ephraim Frank Sobel v. Commissioner
Docket No. 27149.
United States Tax Court
1951 Tax Ct. Memo LEXIS 178; 10 T.C.M. (CCH) 613; T.C.M. (RIA) 51209; June 28, 1951
*178 Decedent, at the time of his death, was the owner of all the stock of a small corporation which had been engaged in the business of installing intercommunication systems in military establishments. For several months prior to his death, decedent was in such poor health that the corporation had practically ceased business. There had been no sales of the corporation's shares of stock in decedent's lifetime. Held, the valuation of the corporation's shares of stock which decedent owned at the time of his death for estate tax purposes must be largely made from the valuation of the corporation's assets at the date of decedent's death. This valuation is determined herein from the evidence in the case. Isador Goetz, Esq., 11 Broadway, New York, N. Y., for the petitioner. Joseph F. Lawless, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in the estate tax of the estate of Ephraim Frank Sobel of $2,997.52. The total value of various stocks and bonds held by the decedent at his death was reported on the estate tax return as $81,383.39. The Commissioner has determined a value of $96,256.92 for the *179 stocks and bonds, an increase in valuation of $14,873.53. Petitioner by appropriate assignment of error contests a portion of the Commissioner's determination, contending that the fair market value of decedent's shares of stock in Military Standard Sound Corporation was $5,583.69 at the date of death. The Commissioner determined their value to be $18,735.64, or a value of $13,151.95 in excess of the value reported on the estate tax return. Findings of Fact The petitioner is the estate of Ephraim Frank Sobel, and Louis Midler is the duly appointed, qualified and acting executor of the last will and testament of Ephraim Frank Sobel, deceased, who died on June 27, 1946, a resident of New York City. The Federal estate tax return was filed with the collector of internal revenue for the second district of New York on July 11, 1947. On December 15, 1949, the Commissioner mailed to the petitioner a notice of deficiency disclosing a deficiency in the estate tax of $2,997.52. The deficiency was in part based upon an increase in the value of the stock of the Military Standard Sound Corporation includible in the decedent's estate from $5,583.69 to $18,735.64. The decedent was the sole *180 owner of the stock of the Military Standard Sound Corporation. This corporation was organized in June 1944 for the purpose of installing intercommunicating systems in military installations. The profitable operation of the corporation depended largely upon the decedent's personal management. The stock of the corporation was never bought or sold during the lifetime of the decedent. It was a small, one-man corporation. The Federal income tax returns of Military Standard Sound Corporation were filed on a fiscal year basis. For its first fiscal period, June 16, 1944 to May 31, 1945, sales amounted to $6,787.70, and its net loss was $789.87. For the fiscal year ending May 31, 1946, its sales were $538.13, rents were $3,325, and its net profit (before income taxes of $141.68) was $1,247.27. The decedent became ill several months before his death on June 27, 1946, and from the onset of decedent's illness the corporation was managed by decedent's attorney. As indicated by the sales for the fiscal year ended May 31, 1946, the corporation had ceased to carry on the business of installing electrical sound equipment. The corporate business consisted principally of renting its lot and building *181 at 1026-1030 Myrtle Avenue, Brooklyn, New York, as indicated by the balance sheet of Military Standard Sound Corporation as of May 31, 1946, as follows: ASSETS
Cash in Bank
$ 1,825.79
Land
$11,580.00
Building
$10,420.00
Less: Reserve for Depreciation
151.95
10,268.05
Fixed Assets (Net)
21,848.05
Prepaid Insurance
$ 263.75
Organization Expenses
77.16
Total Prepaid and Deferred Charges
340.91
Total Assets
$24,014.75
LIABILITIES AND CAPITAL
Federal Income Taxes Payable
$ 141.68
New York Franchise Tax Payable
57.59
Other Accrued Expenses
369.76
Total Current Liabilities
$ 569.03
Loans Payable
$ 2,905.00
First Mortgage Payable
15,225.00
Total Other Liabilities
18,130.00
Capital Stock, 100 Shares Issued and Outstanding
$ 5,000.00
Surplus
315.72
Net Worth
5,315.72
Total Liabilities and Capital
$24,014.75
The principal asset of the corporation on the valuation date, June 27, 1946, was a onestory brick garage type building, with a cement floor, and located on a lot 60 feet by 100 feet. This property was acquired on October 16, 1945, for $22,000. The building was erected *182 about 1921 at a cost of approximately $25,000. In 1945 and 1946, the property had an assessed valuation by the City of New York of $19,000. For corporate accounting and tax purposes, the land was assigned a value of $11,580, and the building a value of $10,420. The building was depreciated on the basis of a 40-year life. The unrecovered cost of land and building on May 31, 1946 was $21,848.05 and on February 28, 1947, the date of sale, was $21,652.69. For some time prior to decedent's death this property was rented to Mafco, Inc., another corporation owned by decedent. The property was offered for sale, as dissolution of Mafco, Inc., was planned. Mafco, Inc., continued to pay rent after the fiscal year ending May 31, 1946, paying a total of $3,000 during the fiscal year ending May 31, 1947. The book value of decedent's stock in Military Standard Sound Corporation as of the end of the fiscal year May 31, 1946 was $5,315.72, as shown by the balance sheet of the corporation. In March 1946, the property was offered for sale to Weinstein, who was operating a sponging and dyeing business on an adjacent site, and at that time the property was listed with two brokers. About the time *183 of decedent's death the property was offered to Weinstein for $23,000, but he rejected the offer. Less than four months after decedent's death, Weinstein displayed an interest in purchasing the property. This interest was occasioned because of the fact that his place of business was damaged by fire, or an explosion, after decedent's death, and he had received some large contracts for sponging and dyeing. One of the brokers negotiated the sale, and a contract was entered into on October 18, 1946, for a sale price of $35,000. The sale was closed February 28, 1947. Expenses incurred in connection with the sale of the property were as follows: Brokerage Fee
$1,750.00
Federal Stamp Tax
23.65
Legal Fees
500.00
Other Expenses
55.00
$2,328.65
Since the gross sales price of the real estate was $35,000, expenses incurred in connection with selling were $2,328.65, and the unrecovered cost of the property was $21,652.69, the Military Standard Sound Corporation realized a gain from the sale of $11,018.66 and paid a tax thereon of about $2,500. The death of Ephraim Frank Sobel made continuation of the business of Military Standard Sound Corporation impossible, and brought *184 also to an end the business of Mafco, Inc., the lessee of the lot and building. After having declined to buy the property about the time of decedent's death for $23,000, Weinstein found it necessary to buy the property for reasons already stated in these findings, and paid therefor a much greater price only four months later. Two real estate brokers testified as to the value of the real estate on June 27, 1946. One appraised the property at $21,000, and the second appraised it at $22,000. The fair market value of this parcel of land, including improvements thereon, was $23,000 at the date of decedent's death. The value of the shares of stock of Military Standard Sound Corporation held by decedent at his death was $6,500. Opinion BLACK, Judge: The decedent, at the time of his death on June 27, 1946 and at all times prior thereto, held all the shares of the capital stock of Military Standard Sound Corporation. Respondent has determined that the value of the shares on that date was $18,735.64, and the only issue in this proceeding is whether respondent erred in this determination. Petitioner contends that the valuation used on the estate tax return, or $5,583.69, is the fair *185 market value of the shares at the date of death. The pertinent portions of Regulations 105 are as follows: "Sec. 81.10 Valuation of property. - (a) General. - * * * The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * * *" In relation to the valuation of unlisted stocks the Regulations provide.. "Sec. 81.10 Valuation of property. - * * *
"(c) Stocks and bonds. - * * * "If actual sales or bona fide bid and asked prices are not available then, * * * the value is to be arrived at * * * in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock. * * *" In determining the value of the shares of stock held by the decedent at his death, the petitioner, as well as the respondent, has relied upon the value of the underlying were principally a building and lot. The sale of the corporation's assets, less the liabilities, of the corporation. The shares of stock were wholly owned by the decedent, and the corporation's *186 assets were principally a building and lot. The sale of the corporation's principal asset was contemplated and attempted prior to decedent's death, and the sale was effected shortly thereafter. The parties herein have further narrowed their controversy to the value of a single asset owned by the corporation, namely, the building and lot at 1026-1030 Myrtle Avenue, Brooklyn, New York. Petitioner contends that the value of the real property on June 27, 1946, was $21,848.05, while the respondent has determined a value of $35,000. [1]
In support of his determination of value, which must be overcome by the burden of proof placed upon petitioner, respondent relies upon the fact that on October 18, 1946, a sales contract was made for the sale of the real estate to one Abraham Weinstein at a price of $35,000. The sales contract was entered *187 into less than four months after the valuation date, the settlement and transfer of the property being delayed however until February 1947. In his determination of value it seems that respondent considered only the sales price of the property occurring four months after decedent's death, ignoring the other facts relating to value. The respondent erred in not following the regulations which provide "and all other relevant factors having a bearing upon the value of the stock." (Regulations 105, section 81.10 (c), supra.) The valuation of petitioner's stock is not unlike that of the valuation of the stock of the Huntington Company in Estate of Henry E. Huntington, 36 B.T.A. 698, where we said at page 715: "It is unnecessary to review the numerous prior decisions of this Board and of the courts involving the question of the valuation of stock under many and varied circumstances. There is no established controlling method for arriving at the value of stock. James Couzens, 11 B.T.A. 1040, 1045, 1165. The problem of a fair determination of the value of stock must be solved by the exercise of sound judgment through the application of a method which is fair and *188 proper under the facts and circumstances as they may appear in each particular case in which the problem is presented. We have carefully considered all of the facts in this voluminous record, including the earnings and book worth of the Huntington Co. and the character of its assets, and we have weighed the expert opinions in the light of the established facts. Where, as in this proceeding, there have been no sales of the stock of a close corporation and, because of the nature of its business and earnings, such earnings and other facts shown by the record do not afford fair and proper criteria, we may look to the fair market value of the assets underlying the stock to ascertain the value thereof." We think the respondent erred in the valuation of the building and lot by relying on the single fact that the gross sale price of the property was $35,000 though the sale was made only four months subsequent to the valuation date. In determining the value of the building and lot all factors relating to its value must be weighed and considered. The corporation purchased the building and lot less than 12 months prior to execution of the sales contract relied upon by respondent. While the *189 sales contract is removed by four months from the valuation date, the purchase of the property at a price of $22,000 was removed from the valuation date by only eight months. This purchase was an arm's length transaction. Two expert witnesses testified for petitioner, one appraising the property at $22,000 and the other at $21,000 on the valuation date. Another witness testified that the real estate was offered for sale to Weinstein about the time of decedent's death, and that he refused the offering price of $23,000. We have found that the fair market value of the property at decedent's death was $23,000. Petitioner contends the sale price of the property on October 18, 1946 was not the fair market value of the property at the date of decedent's death, as Weinstein was under a compulsion to buy, see Regulations 105, section 81.10 (a), supra. While there is no evidence that Weinstein was compelled to buy this particular piece of property in order to abate a nuisance or protect himself from other damages, Weinstein did pay $35,000 for the property in October 1946, but was unwilling to pay $23,000 for the same property in June 1946. Petitioner's witness explains the willingness of *190 Weinstein to pay a higher price for the property in October was due to an increase in Weinstein's business, and a casualty that occurred to Weinstein's building. These developments affecting the price and value of the property arose subsequent to the valuation date, and hence are not factors affecting the valuation of the property. Had these circumstances existed at the time the building was offered to Weinstein for $23,000, surely he would have made the purchase at the lower price. We have concluded that the value of the shares of stock on June 27, 1946 was $6,500. In so doing we have considered all the factors required by section 81.10 (c) of Regulations 105, namely: "If actual sales or bona fide bid and asked prices are not available then, * * * the value is to be arrived at * * * in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity and all other relevant factors having a bearing upon the value of the stock." Decision will be entered under Rule 50. Footnotes
1. In his determination of the value of the shares of stock the respondent has apparently made the following computation: ↩
Sale price of real estate
$35,000.00
Book value of real estate
21,848.05
Excess of sale price over book
value
$13,151.95
Book value of decedent's stock
5,583.69
Commissioner's valuation of stock
$18,735.64